**KMLA BROADCASTING CORPORATION and Musicast, Inc., Plaintiffs,**

v.

**TWENTIETH CENTURY CIGARETTE VENDORS CORPORATION et al., Defendants.**

No. 64–1726.

United States District Court
C. D. California.
Feb. 13, 1967.

Greenberg & Glusker, by Philip Glusker, Beverly Hills, Cal., for plaintiffs.

Mack, Morello & Nast, by Thomas Nast, Los Angeles, Cal., for defendants.

## OPINION OF COURT AND DECISION GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

WHELAN, District Judge.

Plaintiffs sued defendants for judgment to enjoin defendants from manufacturing, distributing, selling or using equipment which picks up multiplex radio transmissions by plaintiff KMLA Broadcasting Corporation [hereafter "KMLA"] without plaintiffs' consent, and for damages to plaintiffs arising out of the violation by defendants of Section 605 of the Communications Act of 1934, Title 47, United States Code, Section 605, in intercepting and publishing such transmissions as well as damages for unfair competition and exemplary damages arising out of such interception and publishing.

Plaintiffs and defendants Twentieth Century Cigarette Vendors Corporation [hereafter "Twentieth Century"] and International Industries, Inc., dba International House of Pancakes [hereafter "International"], which two defendants are the only remaining defendants in the action, have respectively filed motions for summary judgment on the question of liability alone. Plaintiffs on their motion seek declaratory judgment that the transmissions of background music [entitled multiplex transmissions] by KMLA on its subcarrier frequency are non-public radio communications protected by said Section 605 from the activities of defendants and that such activities are in violation of said Act; and that plaintiffs have a private right of action against defendants arising out of the conduct of defendants in violation of said Section 605 and the regulatory pattern thereunder, and unfair competition by defendants by virtue of the same conduct. Defendants on the other hand seek summary judgment that the involved transmissions of plaintiffs are broadcasts not protected by said Section 605 and that defendants are not liable to plaintiffs on a private right of action.

The motions have been submitted to the Court for decision upon an agreed statement of facts, and upon legal memoranda submitted by the parties and upon an amicus curiae brief filed with leave of Court by the Federal Communications Commission. The Court has already announced its decision and this opinion and decision sets forth the grounds of the Court's decision.

This case, where there is no issue as to any fact, material or otherwise, is an appropriate case for partial summary judgment on the question of liability.

It would appear that this is a case of first impression.

## JURISDICTION OF THE COURT

This action arises under the Communications Act of 1934, Title 47, United States Code, Sections 151–609, and the jurisdiction of this Court is founded on that Act and on Title 28, United States Code, Section 1337.

## THE FACTS

Only such facts as are necessary for the understanding of this decision are set forth.

KMLA, a wholly owned subsidiary of plaintiff Musicast, Inc. [hereafter "Musicast"], owns and operates, and has owned and operated at all pertinent times, a FM radio station in the City of Los Angeles, California, under a license from the Federal Communications Commission [hereafter "the Commission"], granting KMLA authority to broadcast. In addition, KMLA has been and is licensed under a Subsidiary Communications Authorization [SCA] to transmit on a separate, subcarrier frequency, a background music program to subscribers. This subcarrier frequency is entitled the multiplex channel; and a FM station broadcasting over its main frequency and at the same time transmitting a background music program to subscribers over its multiplex channel is said to be "multiplexing."

Musicast has been and is, under a license from KMLA, providing background music to industrial and commercial establishments [Musicast's subscribers] in Los Angeles County, California, for a monthly fee. Musicast installed on the premises of each such subscriber a special multiplex receiver fixed to and capable of receiving KMLA's multiplex channel, as well as speakers, amplifiers, volume controls and related equipment. Ownership of the multiplex receiver is always retained by Musicast and the other equipment is either sold or leased to Musicast's subscribers. Musicast services the equipment and provides background music, free of commercials, twenty-four hours of every day, to its subscribers.

There are about six major background music companies, each with between 300 and 800 subscribers, and more than ten smaller background music companies, in Los Angeles County. In the same area there are eight FM radio stations multiplexing background music. There are about 450 FM stations [one-third of all FM stations] in the United States licensed to engage in multiplexing, with related or licensed background music companies.

Neither a FM radio station on its main channel nor an AM radio station [which has only one channel] can broadcast a 100% background music program because rules and regulations of the Commission require all stations to broadcast to the general public a varied program content, some of which has to be the spoken word. FM stations, in operating their main channel, like AM stations, are obligated by the Commission to serve the public interest, provide periodic station identifications, broadcast public service announcements, etc. Background music by radio can thus be obtained only over a subcarrier frequency, separate and apart from, and in addition to, a FM station main channel broadcast.

The main channel broadcasts of FM stations are intended for the public and may be heard without charge by anyone having a radio. On the other hand the background music program of plaintiffs, like those of other FM stations, as transmitted over the multiplex channel, is not

intended for the public but is intended solely for paying subscribers; the background music program can't be heard by the public. No radio manufactured or sold in the United States can receive such multiplex transmissions. Only two or three companies in the United States make the special multiplex receivers which can receive them, and these are now made so that each receiver is capable of picking up the multiplex transmission of only a single FM station. Such multiplex receivers are sold only to, or with the express consent of, the FM station to whose subcarrier frequency the receiver is fixed.

Prior to October 1, 1960, plaintiffs supplied background music to subscribers by the following method, termed "simplexing": their subscribers' receiving radio sets were built with a special circuit which, when actuated by the transmission by KMLA of an electronic signal, a "beep", eliminated from reception by the subscribers' radio sets all spoken words of the KMLA broadcast [there was then no separate subcarrier frequency but only the channel for broadcast to the general public]. Thus the subscribers for background music could have the music transmission, as they wanted it, free of any spoken words while the public received both the music and the spoken material as required by the Commission.

The Commission has prohibited the transmission of background music on a simplex basis and now requires all FM stations who desire to engage in a subscription background music program to do so on a multiplex basis under a special license termed Subsidiary Communications Authorization. In making its rule requiring multiplexing the Commission concluded that the public interest will be served by divorcing subscription services from main channel FM broadcasting.

The aggregate cost to plaintiffs in converting from simplexing to multiplexing was approximately $100,000. This amount covered the cost to KMLA in the installation of multiplex transmission equipment at its radio station and the cost to Musicast of the multiplex receivers installed at the premises of its subscribers, and the cost of removing the old simplex receivers, installing the new multiplex receivers, multiplex aerials, etc.

Since 1959 Musicast has had between 750 and 800 subscribers, each paying an average of $22.60 per month for background music, plus additional charges for the leasing and servicing of equipment. Musicast has a staff of approximately ten electronic and radio technicians for installation and servicing of equipment at its subscribers' premises, ten office employees, a full-time program director; and has spent approximately $3500 per month since 1959 for the promotion, advertising and selling of its music service.

Neither plaintiff owns any copyright in any of the musical selections making up the background music program. Musicast constantly acquires a great number of musical recordings, and selects, edits and arranges the selections in a particular order. The type of music transmitted varies at different hours of the day and even during different days of the week. The program is constantly changed and improved. KMLA transmits such selections over its multiplex transmitter and channel.

The intention of plaintiffs is that the background music be received and used only on the premises of Musicast's subscribers.

### DEFENDANTS' ACTIVITIES

In 1961 Twentieth Century began to offer a background music service for little or no charge to those commercial establishments which would allow it to place its cigarette vending machines on the premises of such establishments. [Under such arrangement the establishment received a certain percentage of the sale price of cigarettes sold through such machines.] During 1961 and 1962 Twentieth Century purchased twelve multiplex receivers of Japanese origin which were fixed to KMLA's multiplex subchannel frequency and installed them and necessary related equipment on the various

premises where Twentieth Century's vending machines were located. Thereafter this equipment received and played the background music transmitted by KMLA on its multiplex channel on each of the premises where Twentieth Century's equipment had been installed, all without the permission of or license from either of plaintiffs.

Commencing in 1962 Twentieth Century supplanted the above-mentioned multiplex receivers with multiplex tuners capable of receiving the background music of all FM stations which were multiplexing. Twentieth Century has installed these variable multiplex tuners to the number of 121 at various commercial establishments which maintained Twentieth Century's vending machines on their premises; and Twentieth Century demonstrated to each of such establishments the capability of the tuner and demonstrated how the tuner could be tuned to pick up the multiplex background music programs of KMLA as well as that of other Los Angeles FM stations providing such type of music over their own multiplex frequencies.

International, which, like Twentieth Century and Musicast, is a California corporation, during the period from 1962 to date had either a fixed multiplex receiver fixed to KMLA's subcarrier frequency or a variable multiplex tuner capable of receiving the background music of KMLA in 24 of its restaurants in the metropolitan area of Los Angeles. All of such receivers and tuners were supplied and serviced by Twentieth Century; and during the period from 1962 to date International received and used in those restaurants the background music transmitted by KMLA over its multiplex subchannel frequency although International has never been a Musicast subscriber and has never sought or obtained any permission or license from either of plaintiffs to do so.

At no time has Twentieth Century or any of its accounts sought or obtained the consent of or license from either of plaintiffs to receive or use the background music program of KMLA.

## PLAINTIFFS' TRANSMISSIONS ARE NONPUBLIC RADIO COMMUNICATIONS PROTECTED BY SECTION 605 OF THE COMMUNICATIONS ACT OF 1934

Section 605 of the Communications Act of 1934, Title 47, U.S.C. § 605, provides a mantle of privacy for all communications, except radio and television broadcasts intended for the public, and those relating to ships in distress, and in pertinent part provides:

" * * * no person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by wire or radio and use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto * * * Provided, That this section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication broadcast, or transmitted by amateurs or others for the use of the general public, or relating to ships in distress."

As to what constitutes "broadcasting", 47 U.S.C. § 153(o) states:

" 'Broadcasting' means the dissemination of radio communications intended to be received by the public, directly or by the intermediary of relay stations."

## RULES AND REGULATIONS OF THE COMMISSION

Rules and regulations of the Commission, published in Volume 47 of Code of Federal Regulations, with regard to background music are in pertinent part as follows:

"§ 73.276 Permissible Transmissions.

"(a) No FM broadcast licensee or permittee shall enter into any * * * arrangement * * * whereby it undertakes to supply, or receives consideration for supplying, on its main channel * * * background music * * * for reception in the place or places of business of any subscriber.

"(b) The transmission (or interruption) of radio energy in the FM broad-

cast band is permissible only pursuant to a station license, program test authorization, Subsidiary Communications Authorization [SCA] or other specific authority therefor."

" § 73.293 Subsidiary Communications Authorizations.

"(a) A FM broadcast licensee or permittee may apply for a Subsidiary Communications Authorization [SCA] to provide limited types of subsidiary services on a multiplex basis. Permissible uses must fall within one or both of the following categories:

"(1) Transmission of programs which are of a broadcast nature, but which are of interest primarily to limited segments of the public wishing to subscribe thereto. Illustrative services include: background music * * *."

" * * * *

"(c) SCA operations may be conducted without restriction as to time so long as the main channel is programmed simultaneously."

"§ 73.294 Nature of the SCA.

"(a) The SCA is of a subsidiary or secondary nature and shall not exist apart from the FM license or permit. * * *"

"(b) The grant or renewal of an FM license or permit shall not be furthered or promoted by the proposed or past operation under an SCA; the licensee must establish that his broadcast operation is in the public interest wholly apart from the SCA activities. [Violation of rules applicable to the SCA operation would, of course, reflect on the licensee's qualifications to hold its broadcast license or permit.]"

"§ 73.295 Operation under Subsidiary Communications Authorization.

"(a) Operations conducted under a Subsidiary Communications Authorization [SCA] shall conform to the uses and purposes authorized by the Commission in granting the SCA application. * * *"

"(b) Superaudible and subaudible tones and pulses may, when authorized by the Commission, be employed by SCA holders to activate and deactivate subscribers' multiplex receivers. The use of these or any other control techniques to delete main channel material is specifically forbidden."

"(c) In all arrangements entered into with outside parties affecting SCA operation, the licensee or permittee must retain control over all material transmitted over the station's facilities * * *."

"(d) The logging, announcement, and other requirements imposed by §§ 73.282, 73.283, 73.284, 73.287, 73.-288, and 73.289 are not applicable to material transmitted on authorized subcarrier frequencies."

The background music program of KMLA conforms to the aforesaid rules and regulations and is a permitted type of subsidiary service on a multiplex basis.

The question of whether KMLA's multiplex transmissions over its subcarrier frequency constitute "broadcasting" so as to make the protections of Section 605 inapplicable because of the *proviso,* supra, hinges on whether KMLA intended a dissemination of its multiplex radio communications to the general public.[1]

■ Here the parties have agreed that neither of plaintiffs had or has intent to

1. In Functional Music Inc. v. Federal Communications Commission, 107 U.S.App. D.C. 34, 274 F.2d 543, 548 (1958), the Court of Appeals for the District of Columbia observed that in order to determine whether a radio station is "broadcasting" it is necessary to determine whether the station intends to have its communications disseminated to the general public. The decision in *Functional Music* is consistent with the position of plaintiffs herein for the Court in *Functional Music* held that on the facts therein involved the radio station had intended public dissemination while in the instant case the agreed facts are that neither of plaintiffs intended that the multiplex transmission of background music here involved was intended for the general public.

transmit their background music program to the general public. It has been held that Section 605 prohibits the interception and divulging by an unauthorized person of a radio communication not intended for the use of the general public or not relating to ships in distress. United States v. Sugden (9th Cir. 1955) 226 F.2d 281, 285; United States v. Fuller, 202 F.Supp. 356 (N.D.Calif., S.Div.1962).[2] Intrastate as well as interstate communications are protected. Benanti v. United States, 355 U.S. 96, 104, 78 S.Ct. 155, 2 L.Ed.2d 126 (1957); Weiss v. United States, 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed. 298 (1939).

The Commission over a long period of time has interpreted the statutory term "broadcasting" not to include transmission such as here involved, and has in fact held that a radio station engaged in broadcasting material of interest only to a particular person or persons [here the transmission of background music is not intended for the general public] is not broadcasting.

Such broadcasting to specific listeners has been ruled by the Commission to be point-to-point communication not authorized by a broadcast license. Scroggin & Company Bank, 1 F.C.C. 194 (1935); Bremer Broadcasting Co., 2 F.C.C. 79 (1935); Adelaide Lillian Carrell, et al., 7 F.C.C. 219 (1939). In the case of KFKB Broadcasting Association, 60 App. D.C. 79, 47 F.2d 670 (1931), the court upheld the Commission's finding that point-to-point broadcasting by a licensee is grounds for denial of renewal of a broadcasting license as not being in the interest of the public. Even before the creation of the Radio Commission [predecessor of the Commission], in 1927 the Secretary of Commerce, acting under the Radio Act of 1912, 37 Stat. 302, held that a station licensed for broadcasting was not authorized to transmit " * * * ac-

knowledgements to individuals relating to the receipt of letters, telegrams and telephone calls * * *." since such transmissions were in essence point-to-point communications. See Department of Commerce Radio Service Bulletin No. 69, January 2, 1923, page 8.

The Commission stated at 11 Pike & Fischer, R.R. 1599 [such interpretation has since been reaffirmed by the Commission] as follows:

"27. Although we have considered the applications of Section 605 in this matter, *we wish to note that the question of the applicability of this Section will, in all probability, be determined by court actions. However, it is our opinion that Section 605 would be contravened by the unauthorized reception of the FM signal only when such a signal is being transmitted only for reception by the special interests of the industrial, mercantile, transportation or other subscribers without any intention of reception by the general public. This would be the case with all transmissions on a multiplex basis.* [Emphasis supplied]

The ruling of the Commission that multiplex transmissions as here involved, pursuant to the Commission's rules on subsidiary communications authorizations, do not have the essential attributes of broadcasting within the meaning of 47 U.S.C. § 153(*o*), and that consequently "Section 605 of the Communications Act is contravened by the unauthorized reception of FM multiplex programs intended solely for reception by industrial, mercantile and other subscribers" is a reasonable determination. When faced with a problem of statutory construction, the courts have unanimously shown great deference to the interpretation given the statute by the officers or agency charged with its administration; particularly is this respect due

---

2. Cf. Cable Vision, Inc. v. KUTV, Inc., 335 F.2d 348 (9th Cir. 1964). The holding in the instant case is clearly distinguishable in that *Cable Vision, Inc.* held only that where a radio broadcast was beamed to the general public, such broadcast is in the public domain, absent matters covered by copyright or some other recognized exception to the policy promoting free access to all matters in the public domain.

when the administrative practice at stake involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new. Power Reactor Co. v. International Union of Electrical, etc., 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed. 2d 924; Udall v. Tallman, (1965) 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616; P. Lorillard Company v. Federal Trade Commission, (3rd Cir. 1959) 267 F.2d 439, 443; Philadelphia Television Broadcasting Co. v. Federal Communications Commission, (1966) 123 U.S.App.D.C. 298, 359 F.2d 282, 283–284.

The nature of FM multiplex transmissions negates any intention that they be received by the public. Multiplex transmissions cannot be received on conventional FM sets, since they are disseminated not over the main broadcast channel but over a subcarrier frequency that can be received only with special equipment not part of the ordinary radio receiving set. Multiplex operations are specifically geared to the special requirements of commercial institutions, industrial plants, retail shops, and other subscribers equipped with this special FM receiving apparatus. Fundamentally, then, multiplexing is a point-to-point communication service, directed to subscribers at specified locations.

Similarly, the regulations governing multiplexing differ markedly from those governing FM and other broadcast authorizations. Thus the use of super-audible and subaudible tones and pulses to delete portions of the material transmitted is permitted in multiplexing but is forbidden in connection with broadcast matter transmitted over the main channel (Section 73.295, 47 CFR 73.295). The logging requirements that apply to FM broadcast stations in connection with programming (47 CFR 73.282), operating (47 CFR 73.283), and maintenance (47 CFR 73.284) are not applicable to Subsidiary Communications Authorizations (47 CFR 73.295(d)). No station

identification announcements are required, and announcements regarding the mechanical reproduction of programs and of program sponsorship identification have been dispensed with (47 CFR 73.287, 73.288 and 73.289; 47 CFR 73.-295(d)). In short, the detailed and comprehensive regulations on these subjects applicable generally to broadcast stations under the regulations of the Commission and, in the case of sponsorship announcements, required by the Act itself (47 U.S.C. § 317) have been regarded by the Commission as inapplicable and out of place with reference to multiplex operations because of their fundamental non-broadcast character.

The facts establish that FM multiplex transmissions of background music do not constitute broadcasting as that term is defined in the Communications Act, 47 U.S.C. § 153(o), and that the unauthorized reception and use of such multiplex transmissions by one other than an authorized subscriber is in violation of Section 605 of the Communications Act, 47 U.S.C. § 605.

The facts establish that International has intercepted plaintiffs' multiplex transmissions and has simultaneously divulged or published the same to the customers of International, all without the consent or license of plaintiffs or either of them. The facts establish that Twentieth Century provided to International the means for so intercepting and divulging the multiplex transmissions with the intent that International should so intercept and divulge or publish.

The Court concludes as a matter of law that the activities of the defendants are in violation of Section 605 of the Communications Act and that such multiplex transmissions are protected from intercepting and divulging. The Court holds that defendant International has itself intercepted and divulged or published the transmissions in violation of the Act and that the acts of defendant Twentieth Century in effect conspiring with defendant International to intercept

and divulge or publish the transmissions or in causing the intercepting and divulging or publishing by International constitute a violation by Twentieth Century of Section 605, under elementary principles of law in the field of conspiracy and torts not here requiring any citation of authority.

## PLAINTIFFS HAVE A PRIVATE CAUSE OF ACTION FOR THE VIOLATION OF SECTION 605 OF THE COMMUNICATIONS ACT AGAINST DEFENDANTS

■ Where, as here, plaintiffs have been aggrieved by the activities of defendants in their violation of Section 605 of the Communications Act of 1934, plaintiffs are entitled to recover damages from defendants in an amount to be hereinafter determined by the Court.

In analogous actions it has been held that where a private person in the enjoyment of the rights or privileges granted to him by federal statutes or administrative regulations of federal agencies has been injured by another, federal courts shall adjust their remedies to grant necessary relief to the injured party. Bell v. Hood (1946), 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed.2d 939, where the Supreme Court said:

> "Moreover, where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief."

Other cases in accord with the principle just cited are: Fratt v. Robinson (9th Cir. 1953) 203 F.2d 627, 37 A.L.R.2d 636; Matheson v. Armbrust (9th Cir. 1960) 284 F.2d 670; Ellis v. Carter (9th Cir. 1961) 291 F.2d 270. Too, where it has been necessary to prevent a third party from interfering with a radio station's rights to operate in accordance with the pattern of operation required by the Federal Communications Commission, courts have not been hesitant to exercise their general equity power. Regents of New Mexico College v. Albuquerque Broadcasting Co. (10th Cir. 1947) 158 F.2d 900; Weiss v. Los Angeles Broadcasting Co. (9th Cir. 1947) 163 F.2d 313, cert. den. 333 U.S. 876, 68 S.Ct. 895, 92 L.Ed. 1152; Carmichael v. Anderson (D.C.Mo.1926) 14 F.2d 166.

The Commission has determined that it is in the federal interest that FM stations be given a multiplex channel for the transmission of background music to subscribers only. Thus plaintiffs, it would seem, have a private, federal right of action because of the federal interest as determined by the Commission, against defendants arising out of their interception and divulgement, even if the background music transmission were held to be "broadcasting" within the meaning of the Communications Act; however, the Court does not rest its decision on such ground as it has determined that such transmissions do not constitute such broadcasting.

In Reitmeister v. Reitmeister (2nd Cir. 1947) 162 F.2d 691, 694, the Court of Appeals for the Second Circuit, in holding that the District Court had jurisdiction of a civil action for damages for violation of Section 605 of the Communications Act, held that a private civil right was created for any injury done to one by others in intercepting and divulging in violation of the Communications Act. Also see Newfield v. Ryan (5th Cir. 1937) 91 F.2d 700, 703; Pugach v. Dollinger (2nd Cir. 1960) 277 F.2d 739, 743.

The Court therefore concludes that there is a private federal cause of action for appropriate relief in favor of plaintiffs and against defendants on the facts herein.

## PLAINTIFFS HAVE CAUSE OF ACTION FOR UNFAIR COMPETITION

■■ In addition to plaintiffs' federal cause of action hereinbefore announced, it appears from the facts that plaintiffs have a pendant cause of action for unfair competition under California

law.[3] Congress has not pre-empted the adjustment of property rights in the communication field by the passage of the Communications Act of 1934. Cable Vision, Inc. v. KUTV, Inc., 335 F.2d 348, 349. This case comes within the rule of International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918), [hereinafter INS]. Under INS unfair competition is found to exist when the acts of a defendant amount to interference and diversion of profit at the point where plaintiff's profit is to be made.

"Unfair competition" is defined by California Civil Code Section 3369, subdivision 3, as "unlawful, unfair or fraudulent business practice." The applicable principles governing California courts are those set forth in INS. McCord Company v. Plotnick (1951) 108 Cal.App. 2d 392, 239 P.2d 32. The tendency of the law in fact is "in the direction of enforcing increasingly higher standards of fairness or commercial morality in trade." See Ramirez & Feraud Chili Co. v. Las Palmas Food Company, (S.D.Cal. 1956) 146 F.Supp. 594, 605.

Here plaintiffs have expended large sums of money, and continue to do so, to provide background music programs to subscribers; and here defendants have appropriated those programs for the purpose of merchandising their products at the point where plaintiffs' profit is to be made, in order to divert a material portion of the profit from those who have earned it to those who have not. The situation is clearly analogous to that in INS; so too is it analogous to the facts in McCord Company v. Plotnick, supra, where the defendant was held liable for appropriating credit information collected by plaintiff and sold by it to its customers.

Courts have followed and applied the doctrine of INS in cases where rights in private enterprises or events for which the investor had granted exclusive TV or Radio licenses were involved,—where the primary purpose of the investor to charge others for the privilege of watching or hearing a program would be frustrated or defeated through exhibition by others than itself or its exclusive licensee. See Pittsburgh Athletic Co. v. KQV Broadcasting Co., (D.C.W.D.Pa. 1938) 24 F.Supp. 490; Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp., 1950, 199 Misc. 786, 101 N.Y.S.2d 483, affirmed 1951, 279 App.Div. 632, 107 N.Y.S.2d 795.

Here, as in the two cases just cited, defendants acted to obtain from plaintiffs for nothing the very thing that plaintiffs were selling.

In summary the Court concludes that plaintiffs are entitled to partial summary judgment adjudging (1) that defendants have violated Section 605 of the Communications Act of 1934, (2) that plaintiffs have a private right of action against defendants arising from their violation of said Act and the regulatory pattern for the radio industry established by the Commission under the Act, and (3) that plaintiffs have a cause of action for unfair competition under California law. Other issues are to be determined at trial. The motions of defendants are accordingly denied.

The foregoing constitutes the findings of fact and conclusions of law of the Court.

Written judgment will be signed and filed by the Court.

---

3. Cable Vision, Inc. v. KUTV, Inc., (9th Cir. 1964) 335 F.2d 348, is not inconsistent with this holding. In *Cable Vision, Inc.*, the court's decision was upon the grounds that the radio communication sought to be protected had been beamed to the general public so that *KUTV, Inc.* had no protectable interest therein absent copyright protection or some other recognized exception to the policy promoting free access to all matter in the public domain. In the instant case the transmissions have not been beamed to the general public and are not a part of the public domain.