Pare LORENTZ, an individual, Plaintiff,

v.

WESTINGHOUSE ELECTRIC CORPO-
RATION, a Pennsylvania Corporation,
Westinghouse Broadcasting Company,
Inc., a corporation, Radio Station
KDKA, a business entity, and John Cig-
na, an Individual, Defendants.

Civ. A. No. C.A. 78–213.

United States District Court,
W. D. Pennsylvania.

April 20, 1979.

See also D.C., 472 F.Supp. 954.

R. Kenly Webster, Kennedy & Webster,
Washington, D. C., Harold R. Schmidt, and
Edward C. Schmidt, Rose, Schmidt, Dixon,
Hasley, Whyte & Hardesty, Pittsburgh, Pa.,
for plaintiff.

David J. Armstrong, and Charles Ken-
rick, Dickie, McCamey & Chilcote, Pitts-
burgh, Pa., for respondents.

## OPINION

SNYDER, Judge.

Pare Lorentz, a motion picture writer and director, seeks money damages from Radio Station KDKA, its talk show host John Cigna, KDKA's owner, Westinghouse Broadcasting, Inc. (WBC), and its parent corporation, Westinghouse Electric Corporation (WEC), for defamatory remarks made during a talk show broadcast on March 1, 1977. Cross Motions for Summary Judgment will be denied.

### I. *Background*

In February of 1977, after considerable radio discussion had been engendered by a television program depicting the life of the late Senator Joseph F. McCarthy called "Tailgunner Joe" and an interview with Roy Cohn, the well known former aide to the Senator, John Cigna had a telephone conversation with a Joseph Mazzei concerning Mazzei's experiences as an undercover agent for the Federal Bureau of Investigation during the "McCarthy period". As a result, Cigna suggested that Mazzei appear as a guest on his show. About two weeks before his scheduled appearance, Mazzei delivered books, magazines, newspaper clippings, Congressional testimony, and other documents to Cigna, who, after studying the material, concluded that Mazzei had in fact infiltrated the Communist movement in the United States during the 1940's and 1950's. The Defendants claim Cigna told Mazzei before the show that during the broadcast he was not to identify anyone as being a Communist who had not previously been identified publicly as a Communist, and Cigna therefore did not anticipate that any accusations would be made which would require the use of the "dump button", which was connected to a tape delay system, during the broadcast. Although the reason is not clear from the record, Cigna called Mazzei by the fictitious name of "Dominic" during the March 1 program, and a discussion ensued between Cigna, his guest, "Dominic", and telephone callers. Relevant portions of the transcript of that broadcast read as follows:

"Guest: A group came into Pittsburgh, photographers, we had a photographer here that was in Spain who made the movie called 'Spanish Earth' and who made a movie for the Resettlement Administration.

Cigna: These were Communists?

Guest: These were Communists. His name was Pierre Lorentz and he made a movie called 'The Plow That Broke The Plains'."

\* \* \* \* \* \*

"Cigna: Good evening . . . you're on the air with our guest.

Caller: Yes . . . I'd like to ask if he remembers the name of the picture that Pierre Lorentz was working on . . . and also, who was the photographer and do you remember?

Guest: You're talking about Pierre Lorentz . . . Pierre Lorentz went to Spain during the Spanish civil war and made the picture called 'Spanish Earth'. He also made the picture called 'Scorched Earth' for the resettlement administration . . . "

\* \* \* \* \* \*

"Caller: And 'The River' . . .

Guest: That's right . . . that's right . . . Pierre Lorentz was one of the biggest communists in hollywood [sic]."

\* \* \* \* \* \*

"Cigna: Well, were Lorentz or any of these people ever convicted of anything?

'Dominic': Yes.

'Dominic'

& Caller: Oh, yes."

\* \* \* \* \* \*

" 'Dominic': [\* \*] . . . was one of the World's greatest photographers, remember that?

Caller: Yes.

'Dominic': Well, [\* \*] and Pierre Lorentz and [\* \*] . . . they were all members of the same cell."

In the course of the broadcast, Cigna was asked by one of the callers why an anony-

mous individual was permitted to make statements such as those set forth above, and Cigna replied:

"The reason Dominic is naming these people is because we have before us and we have checked out testimony given before these committees about these people. And these people were written up in newspaper articles when the hearings went on . . . .. [T]his information is public knowledge."

The Complaint here is in five counts:

Count I alleges negligence, i. e. substandard conduct to a class of persons of whom Lorentz is one, resulting in injury to Lorentz's reputation and his lifetime work.

Count II charges the Defendants with extreme, outrageous and reckless conduct causing severe emotional distress—citing Restatement (Second) of Torts § 46, which provides "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress".

Count III is based on the violation of Federal law, specifically the rule promulgated by the Federal Communications Commission providing, *inter alia*, safeguards to the reputation of an individual who is attacked over the radio.

Count IV states a cause of action in defamation for broadcast tort, a special kind of tort eliminating the necessity of distinction between libel and slander.

Count V alleges a violation of the Plaintiff's right of privacy.

Pretrial Statements were received from all parties after completion of extensive discovery, and leave was granted for the filing of motions for summary judgment. The Plaintiff thereupon filed a Motion for Summary Judgment as to each of the five counts of the Complaint. All Defendants have moved for summary judgment on Count III of the Complaint and, in addition, Defendant KDKA contends it is not an entity capable of suing or being sued, and Defendant WEC contends no basis of liability has been shown as to it.

Lorentz starts with the premise that Mazzei's appearance was planned by Cigna for more than two weeks in advance. He points to the fact that Cigna originated the idea of permitting Mazzei to appear anonymously in order to protect him because of what he might say, *i. e.* that Cigna knew that Mazzei would be making accusations. Under these circumstances, Lorentz contends that an independent investigation of Mazzei should have been conducted to determine his trustworthiness and reliability. Such an investigation, he concludes, would have prevented the occurrence complained of. In particular, he urges that publication did not involve "hot news", and "the seriousness of the charges called for a thorough investigation, but the evidence reveals only sketchy investigation." Citing *Goldwater v. Ginzburg*, 414 F.2d 324 (2nd Cir. 1969), *cert. denied* 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970). *See also Vandenburg v. Newsweek, Inc.*, 507 F.2d 1024, 1026 (5th Cir. 1975) ("[W]hen the story is not 'hot news', as is the case here, the investigation must be thorough . . . .."). Secondly, Lorentz says that at least three of the newspaper articles that Mazzei turned over to Cigna before the show raised serious doubts concerning Mazzei's credibility. One of the articles was entitled "U.S. Admits Mazzei May Have Lied". Another stated that a Government conspiracy case was reversed "apparently because the credibility of one of seven key witnesses (Mazzei) has been challenged in other cases." Still another indicated that Mazzei was accused of having a criminal record. Thirdly, Lorentz contends that during the course of the program, Mazzei several times demonstrated his unreliability by (1) insisting incorrectly that the Korean War was ongoing in 1948 when Lorentz was alleged to have engaged in treacherous activity in Pittsburgh, (2) admitting that he had served as a member of the Communist Party's "goon squad", and (3) admitting that he had been told he had "diarrhea of the mouth". Fourthly, Lorentz believes Cigna and other employees of the Defendant KDKA had the ability to prevent the defamatory remarks from go-

ing over the air through the use of a "dump button", but failed to use this device.

## II. *The Standard of Review*

A motion for summary judgment can be granted only if the record shows "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). The burden is on the moving party to demonstrate that the test is met, and the non-moving party is entitled to the benefit of all reasonable doubts and inferences that may arise in connection with the consideration of such a motion. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (summary judgment overturned when the movant failed to foreclose the possibility of proof of a conspiracy); *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 472–3, 82 S.Ct. 486, 7 L.Ed.2d 458, 464 (1962) (the record must indicate that "it is quite clear what the truth is", and "summary procedures should be used sparingly . . . where motive and intent play leading roles . . . .").

### A. The Negligence Claim

Plaintiff argues that the law imposes the duty "to proceed with due care" where the defendant voluntarily and gratuitously acts by putting on the air an anonymous accuser who makes false and defamatory statements. Stated another way, he claims that an actor has the legal duty to take reasonable care to avoid invading the interests of others if the "interest invaded is protected against unintentional invasion." Citing Restatement (Second) of Torts § 281(a). He then cites various violations of the duty owed by the Defendants in (1) failing to conduct any independent investigation of Mazzei before the show, particularly where the material submitted by Mazzei raised questions as to his credibility, (2) permitting Mazzei to continue the broadcast after he had demonstrated his unreliability several times, and (3) failing to use the "dump button".

On their part, the Defendants argue that mere investigative failure is not sufficient as there must be evidence of malice which they claim is lacking here. They say that the Plaintiff has not and cannot show that the Defendants had obvious reasons to doubt Mazzei's veracity when, in fact, based upon what they knew, the Defendants had obvious reasons to accept Mazzei's veracity. Furthermore, they contend that the materials submitted by Mazzei supported his contentions that he was active in the Communist Party in Pittsburgh in the 1940's and 1950's, that he was an undercover agent for the F.B.I., and that having infiltrated the Pittsburgh Communist organization, he later exposed it and testified publicly against numerous local members.

It is apparent that the parties here disagree on whether John Cigna was negligent in any way in his preparation for and conduct of the March 1 program. There was testimony that Cigna made preparations for the show, that he had seen Lorentz's name in the Congressional testimony furnished by Mazzei before the broadcast, that he did tell Mazzei not to identify on the air as a Communist any person who had not previously been publicly so identified, and that Mazzei himself intended only to name publicly identified Communists on the Cigna show. No doubt argument to the contrary can be made, thus there is a material dispute as to what inferences are to be taken from the varying accounts which raise questions of credibility and the weight of the evidence which are obviously reserved for the fact finder at trial.

Regardless of whether the Plaintiff must prove under the Supreme Court's holdings in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and *Curtis Publishing Company v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), and as defined in *Dickey v. CBS, Inc.*, 583 F.2d 1221, 1227 (3rd Cir. 1978), "that a false statement was published with 'actual malice'—that is, with a knowledge that it was false or with a reckless disregard of whether it was false or not", or whether the "reasonably prudent man" standard of negligence governs, it is clear that the Plaintiff's Motion must be denied as to Count I.

### B. The Intentional Infliction of Emotional Distress

This Plaintiff contends that the Defendants' extreme, outrageous, and reckless conduct entitles him to recover for his severe emotional distress. The Court of Appeals for the Third Circuit in *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1274 (3d Cir., 1979), held that there is such a cause of action under Pennsylvania law but that liability may be found "only where the conduct has been so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." [Quoting Restatement (Second) of Torts § 46, Comment (d).]

In order to grant summary judgment, a court must initially determine not only that there is sufficient evidence for reasonable persons to find extreme or outrageous conduct, but also that no other conclusion could be justified. Otherwise the question is for the jury. Suffice it here on this point to say that there is no conduct shown that constitutes without a question such outrageous conduct. *See, e.g., Chuy v. Philadelphia Eagles, supra* ("The court must determine, as a matter of law, whether there is sufficient evidence for reasonable persons to find extreme or outrageous conduct. If the plaintiff has satisfied this threshold evidentiary requirement, the jury must find the facts and make its own characterization.").

### C. Defendants' Violation of FCC's Personal Attack Rule Gives Rise To Tort Action

The Federal Communications Commission has promulgated a rule which sets forth as follows (47 C.F.R. § 73.123):

"When, during the presentation of views on a controversial issue of public importance, an attack is made upon the honesty, character, integrity or other like personal qualities of an identified person or group, the licensee shall, within a reasonable time and in no event later than 1 week after the attack, transmit to the person or group attacked (1) notification of the date, time and identification of the broadcast; (2) a script or tape (or an accurate summary if a script or tape is not available) of the attack; and (3) an offer of a reasonable opportunity to respond over the licensee's facilities."

The Defendants ask for summary judgment because there is no provision in the Federal Communications Act for civil action.

■ It is the Plaintiff's theory that there is an implied cause of action where an attack is made upon the honesty, character and integrity of an identified person and that the FCC has repeatedly held that when a person is called a Communist, such a characterization is a personal attack. *See In the Matter of Rhode Island Broadcasting Co.,* 49 F.C.C.2d 682 (1974); *In the Matter of WIYN,* 35 F.C.C.2d 175 (1972); *In the Matter of Storer Broadcasting Co.,* 11 F.C.C.2d 678 (1968). The argument runs that the Supreme Court has held the violation of a federal statute or regulation can be redressed through private law suit even though the statute violated does not expressly provide for private remedies. Thus, for example, implied private rights of action have been recognized under the Voting Rights Act of 1965 (42 U.S.C. § 1973, *et seq.*);[1] under Section 14(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78n) and Rule 14a of the Securities Exchange Commission (17 C.F.R. § 240.14a)[2]; under the Safety Appliance Acts (45 U.S.C. § 1 *et seq.*);[3] and under Section 10 of the Securities Exchange Act of 1934 (15 U.S.C. § 78j)[4] and under Rule 10b–5 of the Securi-

---

1. *Allen v. State Board of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969).

2. *J. I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

3. *Texas & Pacific Ry. v. Rigsby,* 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916).

4. *Wilson v. First Houston Investment Corp.,* 566 F.2d 1235 (5th Cir. 1978); *Abrahamson v. Fleschner,* 568 F.2d 862 (2d Cir. 1977), *cert. den.* 436 U.S. 905, 98 S.Ct. 2236, 56 L.Ed.2d 403 (1978).

ties Exchange Commission (17 C.F.R. § 240.10b–5).[5]

The Plaintiff argues with some cogency, following the lead of the Second Circuit in *Reitmeister v. Reitmeister*, 162 F.2d 691 (2nd Cir. 1947), implying a private remedy where there was a criminal penalty for violation of the substantive provisions of the Federal Communications Act, that the private right of action must be implied here. There is no doubt that the Supreme Court has supported private rights of action by inference from criminal statutes, *Wyandotte Transportation Co. v. United States*, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967), as recognized as well in the lower federal courts, *Huff v. Michigan Bell Telephone Co.*, 278 F.Supp. 76 (E.D.Mich.1967); *KMLA Broadcasting Corp. v. Twentieth Century Cigarette Vendors Corp.*, 264 F.Supp. 35 (C.D.Cal.1967). The Defendants, however, have argued that Lorentz has no personal action arising out of the alleged violation of the Personal Attack Rule because the federal courts have repeatedly held that the Federal Communications Act was not designed for the adjustment of private rights. The cases cited by the Defendants were decided under Section 315 of the Act which requires licensees who permit political candidates to use their broadcast facilities to provide equal use opportunities to that candidate's rival. These provisions were to facilitate public debate over radio and television, and were enacted for the benefit of the public and not for a specific class. The Personal Attack Rule is designed to provide a personal remedy and is therefore meant to protect a particular class.

Nor is Defendants' contention that Plaintiff's suit is barred by the exhaustion doctrine applicable here. Lorentz seeks damages which the Commission is not empowered to give, and, consequently, the exhaustion doctrine cannot stand as a bar to that claim. *Skinner & Eddy Corp. v. United States*, 249 U.S. 557, 39 S.Ct. 375, 63 L.Ed.

772 (1919). The requirements set forth by the Supreme Court in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), require us to examine whether such private right of action is consistent with the legislative purpose. The general purpose of the Act is clear—to create a Communications Commission with regulatory power over the forms of electrical communication. S.Rep.No. 781, 73rd Cong., 2d Sess. (1934). The Commission has exercised this power in setting forth the Personal Attack Rule. We find it appropriate to provide interested citizens with a meaningful personal and practical approach to the matter of violations in giving the right to bring suit to redress infractions of the Rule. We note that Count III is not based on defamation, negligent injury, or invasion of privacy; it is based on the fact that, after the attack, the radio station failed to notify Lorentz, advise him of the specifics of the attack, or give him an opportunity to insure that the false statements were corrected. It is only under the Federal Communications Act that such a requirement exists, and there is no comparable requirement under state law which could form the basis for action. Defendants' Motion for Summary Judgment based on the contention that no such cause of action exists must therefore be denied.

As to Plaintiff's Motion for Summary Judgment on this Count, material issues of fact do exist regarding the extent of the disclosure, the time of any disclosure, and the damages resulting from any failure to disclose. Plaintiff's Motion as to this Count must be denied as well.

### D. *Defamation For Broadcast Tort*

Count IV of the Complaint asserts a cause of action which the Plaintiff calls "defamation for broadcast tort". This is in line with the statement of the Pennsylvania Supreme Court in *Summit Hotel Co. v. Nat'l Broadcasting Co.*, 336 Pa. 182, 8 A.2d 302, 309 (1939), where the Court stated:

"The real difficulty arises from attempting to adapt to the new tort of radio

---

**5.** *Mitchell v. Texas Gulf Sulpher Co.*, 446 F.2d 90 (10th Cir.), cert. den. 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971).

defamation, rules of liability applicable in other fields of kindred, but not identical, types of wrong."

A recent summary of the defamation laws, as applicable in Pennsylvania, was set forth by Judge Spaeth in *Curran v. Philadelphia Newspapers, Inc.*, 395 A.2d 1342, 1345–46 (Pa.Super.1978), as follows:

> "The requirement that malice must be proved was established by *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). There the Supreme Court held:
>
> > 'The constitutional guarantees [of freedom of speech and press] require . . . a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.'
> > *Id.*, at 279–80, 84 S.Ct. at 726.

This protection extends to false statements of fact, *id.*, at 271–72, 84 S.Ct. 710, as well as comment or opinion, and malice must be proved with 'convincing clarity,' *id.*, at 285–86, 84 S.Ct. 710.

In later cases the Court elaborated on its definition of malice. Malice was found where there was 'an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.' *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 158, 87 S.Ct. 1975, 1993, 18 L.Ed.2d 1094 (1967). However, ill will and a desire to do harm are not alone sufficient to show malice. *Henry v. Collins*, 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965). In *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), the Court said:

> 'Reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.' "

(Footnote omitted)

The *New York Times* rule on proving actual malice applies to public figures. *Curtis Publishing Co. v. Butts, supra.* The Plaintiff in the instant case, at least in some parts of his affidavit, would have us consider him to be a public figure since his name has been in the public domain for over forty years. We note that in *Gertz v. Welch*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Supreme Court in defining public figures stated:

> "For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classified as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment."

418 U.S. at 345, 94 S.Ct. at 3009, 41 L.Ed.2d at 808. A private person has not accepted public office or assumed an "influential role in ordering society". *Curtis Publishing Co. v. Butts, supra.*

Even if we assume for the purpose of argument that the Plaintiff would be determined to be a private person, the rule of actual malice has been applied in Pennsylvania, as stated by the Pennsylvania Supreme Court in *Matus v. Triangle Publications, Inc.*, 445 Pa. 384, 286 A.2d 357 (1971), *cert. den.* 408 U.S. 930, 92 S.Ct. 2494, 33 L.Ed.2d 343 (1972) (citing *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971)):

> " 'We thus hold that a libel action, as here, by a private individual against a licensed radio station for a defamatory falsehood in a newscast relating to his involvement in an event of public or general concern may be sustained only upon clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reck-

less disregard of whether it was false or not.' "[6]

We well recognized that summary judgment motions are not defeated by allegations that malice presents a jury question. *Curran v. Philadelphia Newspapers, Inc., supra*; *Washington Post Co. v. Keogh*, 125 U.S.App.D.C. 32, 365 F.2d 965 (1966), *cert. den.* 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967). But Lorentz would be entitled to summary judgment only if there was an agreement as to the Defendants' actual malice, the nonavailability of the legal defenses of truth and privilege, and the character of the subject matter of the defamatory comments which these Defendants have plead were not in issue. Under the record here there is a dispute over the existence of actual malice, and the inferences from the testimony on this point are peculiarly those for a jury. Plaintiff's Motion in this regard must be denied.

E. *The Invasion of the Right to Privacy*

The Plaintiff claims that his right to privacy has been invaded by the Defendants who permitted Mazzei to place him in a "false light" by erroneously accusing him of being a Communist, a criminal, and a traitor. Citing *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), which states:

"Calculated falsehood falls into that class of utterances which are 'no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality . . ..' Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection."

385 U.S. at 390, 87 S.Ct. at 543, 17 L.Ed.2d at 468.

In *Leverton v. Curtis Publishing Co.*, 192 F.2d 974 (3rd Cir. 1951), an innocent victim of a traffic accident whose picture was included in an article concerning traffic accidents caused by pedestrian carelessness was permitted recovery because the use of her picture in a context completely unrelated to her accident was found to be an invasion of her privacy.

The foregoing, however, indicates that any such publication must be made with knowledge of its falsity, or at the least in reckless disregard of the truth. We have indicated previously that there are factual disputes between the parties here on the question of whether Mazzei and Cigna published information about Pare Lorentz with knowledge of its falsity or in reckless disregard of the truth. Again, this matter must be determined by a jury. There is no basis for the entry of summary judgment on the Plaintiff's privacy claim.[7]

III. *KDKA and Westinghouse Electric Corporation's Motions for Summary Judgment*

The Affidavit of the Chairman of the Board of WBC, submitted in support of KDKA's Motion, sets forth that KDKA Ra-

---

**6.** In light of *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), and *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), it is unclear whether the standard set forth in *Matus v. Triangle Publications, Inc.*, 445 Pa. 384, 286 A.2d 357 (1971), *cert. den.* 408 U.S. 930, 92 S.Ct. 2494, 33 L.Ed.2d 343 (1972), is still the law in Pennsylvania. *See Mathis v. Philadelphia Newspapers, Inc.*, 455 F.Supp. 406 (E.D. Pa.1978).

**7.** A cause of action for invasion of privacy exists under Pennsylvania law. *Marks v. Bell Telephone Co. of Pennsylvania*, 460 Pa. 73, 331 A.2d 424 (1975); *Vogel v. W. T. Grant Co.*, 458 Pa. 124, 327 A.2d 133 (1974). The Supreme Court of the United States, however, has ex-

pressly reserved the question of whether, in light of *Gertz v. Welch, supra*, "a State may constitutionally apply a more relaxed standard of liability under a false-light theory of invasion of privacy" than is set forth in *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) and the Restatement (Second) of Torts § 652(E). *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 498, n.2, 95 S.Ct. 1029, 43 L.Ed.2d 328, 351, n.2 (1975) (Powell, J. concurring); *Cantrell v. Forest City Publications Co.*, 419 U.S. 245, 250–1, 95 S.Ct. 465, 42 L.Ed.2d 419, 425–6 (1974). We believe, however, that even if a different standard applies, the existence of a material dispute of facts here prevents summary judgment.

dio are call letters granted by the Federal Communications Commission for the sole and exclusive use of WBC. It further sets forth that personnel who work on shows or programs aired on KDKA Radio are all employees of WBC and not employees of KDKA Radio. KDKA Radio is not a corporation, partnership, or legal entity and is thus not a responsible party against which a judgment could be taken.

To the contrary, the Plaintiff points to the fact that KDKA Radio is listed in the Pittsburgh Bell Telephone Book in addition to WBC, that the Cigna Show is advertised as broadcast by "KDKA Radio 1020", and that KDKA separately signs employment contracts with its employees. Cigna's contract is signed by the representatives of WBC and by a representative of KDKA Radio, and it states "KDKA–AM and KDKA–FM hereby employ you". These facts would indicate that KDKA is doing business in its own name and the Plaintiff contends that having held itself out to the public as a business entity and having conducted itself as a business entity, KDKA cannot deny that it is a business entity. *See Puritan Sportswear Corp. v. Shure*, 307 F.Supp. 377 (W.D.Pa.1969); *United States v. Theodore*, 347 F.Supp. 1070 (D.S.C.), *rev'd on other grounds* 479 F.2d 749 (4th Cir. 1973).[8] Under the disputed facts, KDKA's Motion must be denied.

WEC's Affidavit states that it has no right of control over WBC, does not manage or control the actions of employees of WBC in the performance of their work, has no control over the operations and programming of KDKA Radio, and, although John Cigna is an employee of WBC, has never involved itself in the operation of the John Cigna Show on KDKA Radio.

The Plaintiff points to the fact that in WEC's-Annual Report for 1977, it is stated:

"Operations are identified as these four segments: Power System, Industry Products, Public Systems and Broadcasting." He also points to the fact that the WBC financial data is part of or is consolidated into the WEC financial report, since WBC is a wholly owned subsidiary of WEC. Again, in light of these disputes of fact, WBC is not entitled to summary judgment.

## IV. *Summary*

In light of the dispute of material facts involved in all the Motions for Summary Judgment, the Motions will be denied.

An appropriate order will be entered.

---

**8.** In *United States v. Theodore*, 347 F.Supp. 1070 (D.S.C.), *rev'd on other grounds* 479 F.2d 749 (4th Cir. 1973), the Internal Revenue Service sought the business records of an accounting firm. The firm was not a valid corporation under the state law and thus the co-owner argued that the records were his personal property and entitled to Fifth Amendment protec-

tion. However, since the firm held itself out to the general public and the United States as a professional association, it was estopped from denying the existence and viability of its corporate entity. *Also see Pavlovscak v. Lewis*, 274 F.2d 523 (3rd Cir. 1959), *cert. den.* 362 U.S. 990, 80 S.Ct. 1078, 4 L.Ed.2d 1023 (1960); Goodrich-Amram 2d § 2153(a):2.