849 F.2d 665
 270 U.S.App.D.C. 334, 57 USLW 2006
 NATIONAL ASSOCIATION FOR BETTER BROADCASTING, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Home Box Office, Inc., US Satellite Broadcasting Co., Inc.,
Intervenors.
 No. 87-1198.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 9, 1988.
Decided June 17, 1988.
 
 David W. Danner, with whom Andrew Jay Schwartzman, Washington, D.C., was on the brief, for petitioner.
 Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., with whom Diane S. Killory, Gen. Counsel, C. Grey Pash, Jr., Counsel, F.C.C., Robert B. Nicholson, and Laura Heiser, Attys., Dept. of Justice, Washington, D.C., were on the brief for respondents. Gregory M. Christopher, Counsel, F.C.C., and Catherine G. O'Sullivan, Atty., Dept. of Justice, Washington, D.C., also entered appearances, for respondents.
 Jack N. Goodman, with whom Robert J. Aamoth, Washington, D.C., was on the brief, for intervenor, Home Box Office, Inc.
 Marvin Rosenberg and James G. Ennis, Washington, D.C., were on the brief for intervenor, U.S. Satellite Broadcasting Co., Inc.
 Before WALD, Chief Judge, and STARR and SENTELLE, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SENTELLE.
 Dissenting opinion filed by Chief Judge WALD.
 SENTELLE, Circuit Judge:
 
 
 1
 This petition presents for review a decision by the Federal Communications Commission ("the Commission" or "FCC") concerning the status under Title III of the Communications Act of 1934 ("the Act"), 47 U.S.C. Sec. 301 et seq. (1982 & Supp. III 1985) of subscription video services, including subscription television ("STV") and direct broadcast satellite ("DBS") services. Report and Order Subscription Video, 2 F.C.C.Rcd. 1001, Gen. Dkt. No. 85-305 (Feb. 17, 1987) ("Report and Order "). The petition by National Association for Better Broadcasting ("NABB") takes issue with two aspects of the Commission's decision: (1) the Commission's designation of subscription television and subscription direct broadcast satellite services as not being broadcasting within the meaning of the Act, and (2) the Commission's ruling that an existing licensee's change from conventional broadcasting to subscription operation would not be considered a "major" change under the Act or FCC rules. For the reasons outlined below, we uphold the decision of the FCC and deny the petition in both respects.
 
 I. STATUTORY AND REGULATORY BACKGROUND
 
 2
 Title III of the Act establishes a broad grant of authority to the Commission to regulate radio (and television) communications[1] including classification of stations, prescription of the nature of services to be rendered, regulation of the apparatus used, study of new uses and encouragement of more and effective uses of radio, and ultimately the issuance of licenses to operate stations when it finds that the public interest will be served thereby. 47 U.S.C. Secs. 303, 307 (1982).
 
 
 3
 The Act distinguishes between stations engaged in "broadcasting" and those providing fixed point-to-point services. Broadcasting is defined as the "dissemination of radio communications intended to be received by the public, directly or by the intermediary of relay stations." 47 U.S.C. Sec. 153(o ) (1982), Sec. 3(o ) of the Act.[2] The Act imposes certain obligations and restrictions only on those stations that engage in "broadcasting." See, e.g., 47 U.S.C. Secs. 310(b), 312(a)(7), 315, 317, 318, 325, 503(b), 508, 509. Therefore, the determination of whether a station is engaged in broadcasting can at times be critical.
 
 
 4
 In making the determination as to whether a particular transmission constitutes "broadcasting," the Commission, following Sec. 3(o ) and its history, must look to the licensee's intent. However, while the language of the section clearly mandates that the intent of the licensee is crucial in making this determination, neither that section nor any other provision of the Act provides criteria for determining that intent. For many years the Commission looked to the content of the transmissions to ascertain the intent of the licensee, reasoning that "broadcasting" did not occur when the transmissions were designed to be of interest to only a limited number of listeners. For example, the Commission has held that the provision of advice to specific listeners is not broadcasting, Scroggin & Company Bank, 1 F.C.C. 194 (1935); nor messages transmitted in cooperation with local police, Adelaide Lillian Carrell, 7 F.C.C. 219 (1939); nor transmission of coded horse race results, Bremer Broadcasting Co., 2 F.C.C. 79 (1935); nor the transmission of messages requesting a specific doctor to call the physician bureau, KFAB Broadcasting Co., 1 Radio Reg. 2d (P & F) 403 (1963).
 
 
 5
 More directly related to the issues now at bar, the question of subscription radio services vis-a-vis "broadcasting" arose in various contexts over the years. In Muzak Corporation, 8 F.C.C.2d 581 (1941), the Commission considered a proposal to lease decoding equipment to subscribers, without which receipt of the transmission would be disturbed by a discordant sound or "pig's squeal" signal. The Commission at that time held this form of transmission to be broadcasting, since the service was "available to the public generally upon subscription therefor...." Id. Later in the 1955 Report and Order, the Commission concluded that subscription background music services of a sort were not "broadcasting" within the meaning of the Act because they were not primarily intended to be received by the public. Nonbroadcast Activities by FM Stations, 11 Radio Reg. (P & F) 1590, 1591-92 (1955). This Court reversed that decision. Functional Music, Inc. v. FCC, 274 F.2d 543 (D.C.Cir.1958), cert. denied, 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 60 (1959). However, that decision did not involve pure subscription services, but rather a system in which music was simultaneously broadcast to subscribers and other receivers, the broadcasters being able by the transmission of a specific tone to delete advertising and other messages from the receivers of subscribers, leaving them only with the music. This Court held that "broadcasting remains broadcasting even though a segment of those capable of receiving the broadcast signal are equipped to delete a portion of that signal." Id. at 548.
 
 
 6
 But subsequent court and agency decisions addressing "pure" subscription radio services (those receivable only by subscribers) concluded that such services are not "broadcasting" under the Act. E.g., KMLA Broadcasting Corp. v. Twentieth Century Cigarette Vendors Corp., 264 F.Supp. 35 (C.D.Cal.1967); FM Table of Assignments, 61 F.C.C.2d 113, 117-18 (1976); Greater Washington Educ. Telecommunications Ass'n, Inc., 49 F.C.C.2d 948 (1974); WFTL Broadcasting Co., 45 F.C.C.2d 1152 (1974). The Commission exhibited some inconsistency in its treatment of various forms of subscription television service as being or not being "broadcasting."[3] However, with varying degrees of fidelity the Commission clung to a content-based approach, viewing the transmission of programming designed to appeal to mass audiences as constituting "broadcasting," without regard to the technology employed. The combination of rapidly expanding technology and Commission uncertainty finally brought to this Court National Ass'n of Broadcasters v. FCC, 740 F.2d 1190 (D.C.Cir.1984). In that case, we vacated a portion of the underlying FCC decision which had held DBS satellite lessees distributing programming to individual homes not to be engaged in broadcasting. We did so noting that "the test for whether a particular activity constitutes broadcasting is whether there is 'an intent for public distribution' and whether programming is 'of interest to the general ... audience.' " Id. at 1201 (citations omitted) (emphasis in original). We held that "the FCC at the time of the DBS decision was bound not to depart without reasoned explanation" from its prior determination that the appeal to general public as opposed to message-specific individuals distinguishes broadcasting from point-to-point service, and reminded the Commission of its prior words that " 'broadcasting remains broadcasting even though a segment of the public is unable to receive programs without special equipment ....' " Id., quoting from Further Notice in the Matter of Subscription Television Service, 3 F.C.C.2d 1, 9-10 (1966). Thereafter, in January of 1986, the Commission published a Notice of Proposed Rulemaking, proposing to classify subscription video services as point-to-multipoint nonbroadcast video services rather than as broadcasting. Subscription Video Services, 51 Fed.Reg. 1817 (1986). The Commission proposed to, and ultimately did, adopt new indicia of intent, abandoning the program content method, focusing on technology and re-classifying the SVS now before this Court as being outside the statutory definition of "broadcasting." Report and Order, Subscription Video, 2 F.C.C.Rcd. 1001 (1987). It is this decision of the Commission that petitioner now seeks to have us vacate.
 
 II. ANALYSIS
 
 7
 As noted above, petitioner attacks both the Commission's new criteria for determining intent and therefore exclusion from "broadcasting," and the determination that a change from conventional "free" telecasting to subscription services is not a "major" change. We will discuss these attacks in turn.
 
 
 8
 A. The New Criteria for "Broadcasting"
 
 
 9
 As indicated above, the Commission in its February 1987 Order abandoned the previous content-based intent determination, finding new indicia of intent relating to the use by the programming services of transmission techniques preventing the reception of the programming by nonsubscribers. Report and Order at p 40, et seq. Under the new approach, such signals as STV and DBS, being unreceivable without special antenna converters and/or decoding equipment supplied by the licensee or programmer, are now classified by the Commission as "point to multi-point" services rather than broadcasting. Shortly put, the Commission's determination, focusing on the transmission and receipt techniques involved, rather than program content, is that the licensee or programmer intends the signal to be received only by subscribers and not by the general public. Cf. National Ass'n of Broadcasters v. FCC, 740 F.2d 1190 (D.C.Cir.1984).
 
 
 10
 To restate the familiar, the Commission's "construction of a statutory scheme it is entrusted to administer" is entitled to great deference. Chevron v. Natural Resources Defense Council, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). However, as Chevron teaches, before we apply that deference we must first ask the question "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the Court, as well as the Agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43, 104 S.Ct. at 2781. Petitioner argues here that the Commission's determination is contrary to the express intent of Congress.[4] First, petitioner asserts the absence of any adjective modifying the word "public" in Congress' definition of "broadcasting" in Sec. 3(o ) of the Act, arguing that the Commission's new rule focusing on whether a signal is receivable by the "indeterminate" public or by a limited number of subscribers improperly departs from Congress' definition of broadcasting. NABB contends that since the programmer makes the signal available to as many of the public as will buy it, the communication is "intended to be received by the public" within the meaning of the Act. While having a certain facial appeal, this argument proves too much. No matter how broadcasting is distinguished from point-to-point or other nonbroadcasting transmissions, the nonbroadcast signals are intended for some part of the public and presumably, in commercial situations, for as many of the public as will "buy" them. Even under the old content-based criteria it was important to this Court that a signal was " 'of interest to the general ... audience.' " National Ass'n of Broadcasters v. FCC, 740 F.2d at 1201 (citations omitted) (emphasis in original).
 
 
 11
 Beyond the language of the statute, petitioner quite properly urges that we look to the history of the legislation to determine Congressional intent. C.f. National Ass'n of Broadcasters v. FCC, 740 F.2d at 1202. Specifically, petitioner notes that Senator Dill, a principal sponsor of the original legislation, in the debates concerning the legislation used the term "broadcast" in a broad sense inconsistent with the limitations the Commission now seeks to apply. Specifically, Dill stated, referring to the possibility of possible future "inventions" limiting the availability of particular transmissions to subscribers, "[I]f any broadcaster wants so to limit his listening public to those who have bought the attachment, while the other broadcasters allow everybody to listen, that is his privilege." 68 Cong.Rec. 3033 (1926) (emphasis supplied). As petitioner further notes, Dill and other Senators extended that colloquy, repeatedly referring to stations using such an attachment as "broadcasters" contrasting them only with "general broadcasting." Id. Once again, while that argument has a certain appeal, it proves too much. Further review of the recorded debate and Senator Dill's involvement in it makes it plain that the Senators did not purport to be using the term "broadcasting" in any technical sense. For example, the colloquy between Senators Pitman and Dill at 68 Cong.Rec. 3227 shows Pitman asking Dill a question in terms of "broadcasting" and Dill responding with an example concerning interoceanic telephone, which even petitioner and the dissent presumably would concede is a point-to-point service. It must be presumed that the Senators, like most of the rest of us, at times use "broadcasting" not in its statutorily defined sense, as in Section 3(o ), but as if it were synonymous with "transmission." In sum, the legislative history in this case, as in Chevron itself, is at best ambiguous. Therefore, there being no "unambiguously expressed intent of Congress" we must move to the second tier of the Chevron analysis.
 
 
 12
 Having determined that Congress has not unambiguously defined the meaning of "intended to be received by the public" in the definition of "broadcasting" and noting that the Commission has now done so, the principle of deference requires us to determine not whether the agency's choice is the best one, but merely whether it is "reasonable," and if so, afford it controlling weight unless it is arbitrary, capricious, or manifestly contrary to the statute. As the language of the Act and its ambiguous history reveal, this administrative decision cannot be held manifestly contrary to the statute.[5] Therefore, we will uphold the Commission's new rule unless it is arbitrary or capricious. Petitioner would have us find arbitrariness and capriciousness in an alleged inconsistency between the new criteria and prior court decisions, specifically NAB v. FCC, 740 F.2d 1190 (D.C.Cir.1984). As we noted above, that decision did require the FCC "not to depart without reasoned explanation" from its prior conclusions that subscription services were broadcasting. However, the FCC in a properly noticed rulemaking has now supplied that reasoned explanation. Without rehashing the entire language of the Report and Order, the Commission's conclusions in paragraphs 41 and 42 that "subscription program services exhibit the most significant indicia of intent of the purveyor that the service not be received by the public," pointing to the special equipment requirements already mentioned and the "private contractual relationship" between the purveyor and the subscribing audience certainly constitute a reasoned explanation. The Commission's decision is neither arbitrary nor capricious and is within the authority given by Congress. Therefore, it must be upheld.
 
 B. The "Major" Change
 
 13
 Petitioner's other objection to the FCC's new classification of the subscription services focuses on the decision that initiation of pay t.v. service by a licensee previously offering "free" broadcasting service would not constitute a "major" change under Sec. 309 of the Act. Report and Order, p 43. The significance of this decision is that Sec. 309 requires the Commission upon the filing of an application for "any substantial amendment" of a license, 47 U.S.C. Sec. 309(b), to determine "whether the public interest, convenience and necessity will be served" by allowing the application. 47 U.S.C. Sec. 309(a) (1982). In the process of that determination, public notice must be given, 47 U.S.C. Sec. 309(b); 47 C.F.R. Sec. 73.3580. Interested parties may file petitions for denial of such applications, 47 U.S.C. Sec. 309(d); 47 C.F.R. Sec. 73.3584. The Commission must hold hearings where appropriate. 47 U.S.C. Sec. 309(e); 47 C.F.R. Sec. 73.3593. However, the Sec. 309 requirements do not apply to applications for "a minor change in the facilities of an authorized station." 47 U.S.C. Sec. 309(c)(2)(A). Therefore, the decision by the Commission that the change from "free" broadcasting to subscription service does not constitute a "major change" is a decision of great significance. Petitioner contends it is one which we must void since, they argue, even applying the Chevron standard, the decision of the Commission is arbitrary and capricious.
 
 
 14
 It is counterintuitive to hold that nothing major has changed when a television viewer who is accustomed to turning to channel 9, for example, and receiving his favorite program, finds one day that upon turning to that same channel he receives merely scrambled static, which he cannot decipher without the aid of an expensive decoder. However, the counterintuitiveness of an agency decision does not necessarily render it a decision which we can vacate under the Chevron standard.
 
 
 15
 Nothing in the Act indicates that Congress had a specific intent as to what constituted a "major" change. Therefore, again applying the Chevron analysis, the Court must determine "not whether in its view the concept is 'inappropriate' ... but whether the [agency's] view that it is appropriate ... is a reasonable one." Chevron, 467 U.S. at 845, 104 S.Ct. at 2783. Again, we must ask whether the decision was an arbitrary and capricious one. It is not. The Commission's stated rationale is a reasoned one that "[c]urrently, the only TV facilities modifications that are considered 'major' are changes in frequency and city of license." Report and Order at p 43 (citing 47 C.F.R. 73.3572(a)(1)). So the Commission has, with apparent consistency, followed the reasoning that a change is "major" only when it affects the interference potential of the station, the preclusive effect of the operation on other potential stations or the area served. Report and Order at p 43. Since the change from "free" broadcasting to subscription point-to-multipoint service has none of these effects, it cannot be arbitrary and capricious for the Commission in reasoned adherence to its existing practices to hold that this change is not "major."
 
 
 16
 Nonetheless, in this regard, we join the petitioner's observation that the Commission is entrusted with its power and responsibility largely for the protection of the public interest. E.g., 47 U.S.C. Sec. 309(a). If, as petitioner fears, a mass exodus of transmitting services from "free" broadcasting to subscription viewing now occurs, or if the only stations in a given market make such a transformation, the Commission might be well advised to recall its power under NAB v. FCC, supra, and this decision to make changes in its own interpretation of its enabling act and revisit the question of what constitutes a "major" change.
 
 III. CONCLUSION
 
 17
 For the reasons set forth above, NABB's petition is denied and the decision of the Commission is affirmed.
 
 WALD, Chief Judge, dissenting:
 
 18
 I agree with former FCC Commissioner Rivera: "It looks like broadcasting, smells like broadcasting, tastes like broadcasting, has all the benefits of broadcasting, but it's not regulated like broadcasting because it didn't exist when the Communications Act was adopted?"[1]
 
 
 19
 "Broadcasting" is defined in the Communications Act of 1934 as:
 
 
 20
 ... the dissemination of radio communications intended to be received by the public, directly or by the intermediary of relay stations.
 
 
 21
 47 U.S.C. Sec. 153(o ) (1982). After more than 50 years,[2] the Commission reads the "public" to mean "an intederminate public," and, therefore, concludes that dissemination to viewers who may pay to watch is never "broadcasting." Joint Appendix (J.A.) at 115. So narrow a view of the scope of the Act runs contrary to its avowed purpose.
 
 
 22
 The majority, relying heavily on Chevron deference to an agency's interpretation of its enabling statute, accepts the Commission's newly-minted position that pay television services do not qualify as "broadcasting" under the 1934 Communication Act. Maj. op. at 668 (citing Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). The Commission precariously rests that position on the need for special equipment to receive the service and the contractual relationship between the subscribers and programmer. Maj. op. at 670. Neither circumstance, in my view, justifies redefining "broadcasting" to exempt all types of pay TV from the "public interest" requirements of Title III of the Communications Act.
 
 
 23
 When the legislative history of the Act and the purposes of Title III are given their due, the Commission's redefinition of "broadcasting," as excluding all types of pay TV, cannot tow the mark.[3] Not only did the 1927 and 1934 Congresses consider the special fixtures and contracts that subscription services might entail, but they expressly declined to rest any regulatory distinctions upon these factors. Congress was right then and the Commission is wrong now; the pay factor alone is an insufficient basis for a regulatory exemption from the public interest requirements imposed upon those who control the airwaves.
 
 
 24
 I dissent as well from the majority's assent to the Commission's decision that a station abandoning free television broadcasting in favor of paid subscription service undertakes only a "minor change" and is therefore exempt from the notice and hearing requirements of Sec. 309. 47 U.S.C. Sec. 309 (1982).
 
 
 25
 I. THE LEGISLATIVE HISTORY OF THE COMMUNICATIONS ACT
 
 
 26
 We begin with the 1927 Radio Act,[4] the first major federal legislation dealing with broadcasting. The Commission itself acknowledged that the congressional debates and reports relating to the adoption of the 1934 Communications Act by themselves tell us little about what regulatory status Congress envisioned for subscription radio services.[5] We can find substantial guidance, however, in Congress' deliberations on the pay subscription issue during the passage of the 1927 Radio Act. Because the relevant provisions of the 1927 Act were reenacted virtually without change in Title III of the Communications Act, these deliberations deserve serious consideration.
 
 A. The 1927 Radio Act
 
 27
 The 1927 Radio Act did not define "broadcasting," for, as its principal sponsor noted, "there is no question at all what is meant by 'broadcasting'...."[6] The congressional debates indicate that the common understanding then was that "broadcasting" included subscription services directed to a general audience as well as "free" broadcasting.
 
 
 28
 1. Congress intended to provide for future types of broadcasting
 
 
 29
 Congress designed the 1927 Radio Act as a broad and flexible measure, which would deal not only with current technology but also provide a framework for resolving future problems arising out of new radio technologies. Senator Dill, the Act's "principal architect,"[7] explained that "legislation [is] imperative if government is to retain jurisdiction over radio transmission in its many present and developing forms." 67 Cong.Rec. 12,351 (1926) (emphasis added). He also remarked that Congress "tried, so far as possible, to make the bill broad enough to take care of future developments." Id. at 12,352. In the House, Representative Black of Texas expressed the consensus that "radio is just in its infancy, ... it will be one of the marvelous developments of the future." 67 Cong.Rec. 5498 (1926). Representative Moore of Virginia, accurately summed up the mood of the 69th Congress: "I believe that when we start to legislate broadly on a great subject like the one involved in this bill, we should start right and make the legislation as comprehensive as most of us admit that it should be." 67 Cong.Rec. 5579 (1926). Thus, both the House and Senate explicitly intended to provide a statute that was flexible enough to regulate the technology of the future.
 
 
 30
 2. Congress foresaw the development of subscription radio service and considered it broadcasting.
 
 
 31
 More critically, throughout the 1927 Radio Act debates, Congress expressly contemplated the advent of subscription services and assumed that they would, at a minimum, be subject to the same regulation as other forms of broadcasting. This forecast of pay broadcasting services refutes the majority's claim that the Commission's reclassification results from "focusing on technology." Maj. op. at 668. Indeed, the majority ignores the plethora of references to subscription services throughout the legislative history of the 1927 Act.
 
 
 32
 Several Congressmen in 1927 worried about "broadcasters" charging listeners.[8] Senator Dill himself explained:
 
 
 33
 I do not believe, ... that any broadcasting station can hope to prosper if it attempts to ... charge the listener in; but I know of no reason why the Congress should interfere with that kind of private business.
 
 
 34
 68 Cong.Rec. 2881 (1927) (emphasis added). He later reiterated:
 
 
 35
 I understand there are inventions for broadcasting that would make it necessary for the person who listens ... to pay a charge in the form of having an attachment that would enable him to receive that particular broadcasting ... [I]f any broadcaster wants so to limit his listening public to those who have bought the attachment, while the other broadcasters allow everybody to listen, that is his privilege.
 
 
 36
 Id. at 3033 (1927) (emphasis added). While the precise technology involved in this case may have been "only dimly anticipated at the time ... of the Act," maj. op. at 669 n. 5, subscription service was explicitly identified as "broadcasting" and subjected to the same regulatory requirements.[9]
 
 
 37
 In fact, Congress debated, not whether paid subscription service should be exempt from statutory restrictions, but, whether it should receive more regulation than free radio. For example, Senator Copeland worried that subscription broadcasting might lead to monopoly:
 
 
 38
 Suppose all these broadcasters enter into a plan of scrapping all the receivers now in use; what a tremendously profitable game that would be. There would be created a monopoly by means of which all the thousands of people in this country who have radio sets would have them all scrapped and would be forced to buy a machine which would receive their wavelengths.
 
 
 39
 68 Cong.Rec. 3033 (1927) (emphasis added). As a result, the Senate bill contained an explicit provision to protect listeners from unreasonable subscription rates.[10] The House also discussed a provision that would have prohibited subscription services entirely.[11] Although neither provision was adopted, their consideration reveals that Congress did not intend to exempt those broadcasters who chose to provide service on a subscription, rather than advertiser-funded, basis from the requirements imposed under the Act. There was not a word mentioned about any such exemption throughout the numerous days of debate: the clear assumption was that subscription service would be subject to at least the same regulations as free broadcasting.[12]
 
 
 40
 3. Congress' concerns in regulating broadcasting apply with equal force to pay services.
 
 
 41
 While Congress' principal concern in enacting the 1927 Radio Act was to end spectrum interference, another major purpose was to protect the public from potential abuse by powerful broadcasters. The legislators recognized the danger:
 
 
 42
 [Broadcasting] can mold and crystalize sentiment as no agency in the past has been able to do. If the strong arm of the law does not prevent monopoly ownership and make discrimination by such stations illegal, American thought and American politics will be largely at the mercy of those who operate these stations.
 
 
 43
 67 Cong.Rec. 5558 (1926) (statement of Rep. Johnson). The legislative history of the 1927 Radio Act leaves no doubt that Congress was concerned about political discrimination and manipulation by powerful media owners.
 
 
 44
 The broadcast field holds untold potentialities in a political and propagandizing way; its future use in this respect will undoubtedly be extensive and effective.
 
 
 45
 H.R.Rep. No. 464, 69th Cong., 1st Sess. 16 (1926) (minority views). The vice-president of the largest firm in the radio industry conceded that, "So powerful an instrument for good should be kept free from partisan manipulation." Id. These concerns led the majority of the 1927 Congress to enact statutory restrictions on all broadcasters, which were reenacted as Title III of the Communications Act seven years later.[13]
 
 
 46
 For example, the provision ensuring equal media access for political candidates evoked substantial debate over whether broadcasters should be made common carriers as to all candidates for public office. 67 Cong.Rec. 12,502-03 (1926). (statements of Sens. Dill and Cummins). Similarly, it was suggested that the equal access principle should be extended to all matters of public concern, not just political candidates. Id. at 12,503-04 (statement of Sen. Howell). Although these more intrusive measures were ultimately rejected in favor of the present equal access provision (then section 18),[14] they bespeak Congress' strong desire to control the power of the new broadcast media.
 
 
 47
 An interchange in the midst of House debate on the Radio Act makes clear that Congress intended its restrictions on the media's exercise of power to apply to subscription as well as free services. Representative Davis, the unsuccessful proponent of specific anti-monopoly provisions, was asked whether the bill, without his amendment, would "increase the danger of charging for listening in." 68 Cong.Rec. 2577 (1927) (statement of Rep. Box). After responding that he believed that the bill should have forbidden "a charge to listeners," Davis listed provisions still in the bill that he thought would protect subscription listeners, to some degree, from abuse. For example, he said, the Commission could revoke a license when a radio broadcaster was found to be "charging an unreasonable rate or engaging in discrimination." Id. He also cited the Section 18 requirement that "if a broadcasting station permits a legally qualified candidate for public office to make a political speech through their station they shall afford an equal opportunity to his opponent," id., as a provision that protected even those listeners charged for radio service.
 
 
 48
 In the same discussion about threats to listeners, Representative Lazaro mentioned, among other applicable protections in the bill, its ban against "foreign control of any radio stations." Id. at 2578. He also reminded that under the bill "[a]ll national broadcast paid for by individuals or firms will have to be announced by the producing stations as paid for or furnished by such individual or firm...." Id.[15] Representative Lazaro, and ultimately Congress as a whole, concluded that these protections were adequate to shield listeners against broadcasters' misuse of power, id., including abuse by those "charging for listening in."
 
 
 49
 Now, ironically, fifty years later, the Commission abandons those very restrictions that the 1927 Congress worried might be insufficient to protect subscribers to broadcast services.
 
 B. The Communications Act of 1934
 
 50
 When, seven years later, Congress replaced the 1927 Radio Act with the Communications Act of 1934, it reenacted in Title III the equal access provision and several other restrictions just discussed. Furthermore, there was not a word during the passage of the 1934 Act to suggest that Congress had in any way altered its 1927 view that protection against the dangers of political partisanship were just as necessary in direct-charge as in advertiser-funded radio broadcasting.[16]
 
 
 51
 The 1934 Act defined "broadcasting" for the first time and did so in a way designed primarily to distinguish broadcasting from common carrier services.[17] The precise language of Sec. 153(o ) was drawn from the Washington International Radiotelegraph Convention of 1927, which defined a "broadcasting service" as "a service carrying on the dissemination of radio communications intended to be received by the public...."[18] The Commission makes much of the fact that the 1927 Convention excluded fixed, or point-to-point, services from broadcasting. This historical argument, however, does not support the exclusion of present-day subscription services from the category of "broadcasting." Point-to-point services were defined negatively in the 1927 Convention as "radio communications of any kind between fixed points, exclusive of broadcasting...." Id. (emphasis added). Thus point-to-point services were simply a residual category for those private-message uses of radio not "intended to be received by the public." The Commission's argument based on the dichotomy in the 1927 Convention is therefore circular. The Commission fails, moreover, to point to any 1927-1934 service that, like today's STV, provided information and entertainment programming to the general public yet was considered a "fixed service."
 
 
 52
 The definition of broadcasting in the 1934 Communications Act, contrary to the Commission's claim and following the lead of the 1927 Radio Act, was designed to be comprehensive and nontechnical, expressly excluding only common carrier services.[19] Indeed, Congress' desire that the 1934 Act provide a continuing comprehensive regulatory framework was evidenced by specific provision for the study and nurture of "new uses for radio,...." 47 U.S.C. Sec. 303(g).
 
 
 53
 Finally, in the 1934 Act, Congress endorsed the balance between broadcaster freedom and public protection established in the 1927 Radio Act, by incorporating into Title III of the Communications Act the substantial part of the 1927 broadcast regulations. It notably failed even to mention, let alone reconsider, the subscription service issue. There is absolutely no basis on which to find a departure from its 1927 resolution that if subscription services developed, they should be subject to the same Title III requirements as the rest of broadcasting.
 
 
 54
 In refusing now--fifty years later--to apply Title III regulations to subscription television services, the FCC and the majority have too casually swept aside the congressional concerns that gave rise to Title III.[20] In so doing, they have, I believe, evaded Congress' discernible intent--reflected in both the 1927 and 1934 Acts--to protect all the listening public, pay and free, from broadcaster abuse.
 
 
 55
 II. THE PURPOSES OF SEC. 153(O ) AND TITLE III
 
 
 56
 Apart from its contradiction of congressional intent, the Commission's exemption of subscription TV from the Title III restraints imposed on other broadcasters makes no sense in light of the policies and purposes which underly these provisions. Even if it had the power to allow such an exclusion, the Commission has provided no satisfactory rationale for distinguishing between viewer-funded and advertiser-funded television in this respect.
 
 A. The Technological Change Rationale
 
 57
 The Commission's attempt to base its redefinition of broadcasting on the technological details of subscription service does not withstand analysis. First, as we have seen, the 1927 Congress already contemplated technologies that would allow radio broadcasters to prevent all but paying subscribers from receiving their signals.[21] Thus customer-"addressability" is not a brand new phenomenon at all. While the necessity of special receivers or decoders may in some circumstances suggest an intent not to disseminate programs to the general public, the legislative history of the 1927 Act makes unmistakably clear that Congress did not mean for special equipment to provide a letter of transit out of the Act's public interest requirements.[22]
 
 
 58
 Furthermore, the technology employed by most subscription television services, unlike cable, which Congress nonetheless chose to subject to Title III-like requirements,[23] is more analogous to traditional television broadcasting than to any of its currently unregulated communications cousins. STV and conventional broadcast services often have similar methods of transmission and may transmit the same kind of information. For example, both types of service employ omnidirectional point-to-multipoint transmission patterns.[24] They also have similar capacities to deliver information of the same amount and type over six-megahertz-wide channels.[25]
 
 
 59
 STV licensees, like traditional broadcasting stations, normally possess "the ability to exercise editorial control over programming that is transmitted and of interest to the general public and that may entertain, inform, and persuade regardless of its subscription nature."[26] Most important, both STV and conventional free service are used for the distribution of general interest video programming to the public. Thus, STV shares most characteristics of traditional broadcasting, including its primary one--i.e., transmissions are directed toward "as many people as can be interested in the particular program as distinguished from a point-to-point message service to specified individuals," National Ass'n of Broadcasters v. FCC, 740 F.2d at 1201 (citing Subscription Television Service, 3 F.C.C.2d 1, 9-10 (1966)).
 
 
 60
 At any rate, in National Association of Broadcasters, we rejected the notion that simply because Congress does not specifically predict the development of a particular broadcast technology, it need not be regulated as broadcasting. Id. at 1203. On close inspection there is nothing in the Commission's incantation of "technological change," to explain the deliverance of STV from all broadcast regulation,[27] except perhaps the Commission's apparent desire to forego Title III regulation of as many burgeoning spectrum uses as possible.
 
 B. The Contractual Relationship Rationale
 
 61
 The Commission claims that because STV involves a contractual relationship between the viewers and the service-provider, its regulatory status should be different from broadcasting. This distinction, however, is irrelevant for purposes of Title III. The Commission itself admits that a "subscription service provider would not ordinarily refuse service to as many members of the public as may be interested in receiving the programming in exchange for a fee...." J.A. at 115.[28] It seems disingenuous then to argue that merely because a fee is charged, these omnidirectional transmissions are not "intended to be received by the public," 47 U.S.C. Sec. 153(o ). Subscription television providers obviously do not care about the identities of the particular individuals to whom their communications are transmitted; their real goal is to obtain revenues from any and all possible viewers.[29] In that sense, they are just like newspaper publishers or movie producers--their products are aimed at the general public, so long as that public can pay.
 
 
 62
 The practical effect of the FCC's action is to remove the listener protections of Title III from that portion of the television viewing public that can afford to pay for subscription television. Yet there is no reason--consistent with the Act's emphasis on protecting the public from receiving one-sided partisan or propagandizing programming--to deny viewers statutory protections solely on the grounds that they have paid to view.
 
 
 63
 Ironically, Congress' original rationale for Title III regulation applies with even greater force to the paying audience in today's age of multi-million dollar election campaigns.[30] The impact of one persuasive political candidate allowed exclusive use of a subscription video forum catering to a high income level TV audience might well be greater than that of a candidate with similar access to the more modest audience of a conventional broadcast station.
 
 
 64
 The Commission predictably makes the market-oriented pitch that because of their economic relationship to the service provider, subscription television viewers do not need Title III protection; if they do not like the political orientation of an STV channel, or if they object to some other aspect of its programming, they can cancel their subscription. But this possibility, even if realistic, does not distinguish them in any real sense from free TV viewers. Free TV viewers can also, at least in theory, influence program content through participation in TV rating polls and, more commonly, through their patronage of program sponsors. Yet, Title III protections are still deemed necessary to protect the public from broadcaster abuses. Congress' considered judgment is that, despite such leverage, individual viewers still need Title III's basic rules of fairplay to protect against one-sided exposure or other forms of political manipulation through broadcasting.[31]
 
 
 65
 The Commission, however, claims that at least in large cities STV viewers have access to other sources of information about candidates and that therefore the access requirements of Secs. 315 and 312(a)(7) are superfluous. But this response proves too much; in large cities, free TV viewers as well have access to multiple channels yet neither Congress nor the FCC suggests that this vitiates the need for Title III regulation. The Commission's decision, on the other hand, skips too blithely over the plight of the small cities and rural areas where pay TV could be the only source of information, political or otherwise. Its speculative assumption that no one will use pay TV in such areas for political purposes is not only condescending but unsupported.
 
 
 66
 The Commission further argues that it has not been made aware of any access problems with other services not subject to Title III requirements. J.A. at 116. In replying to a similar argument in Telecommunications Research & Action Center v. FCC, 836 F.2d 1349 (D.C.Cir.1988), we pointed out that it is the Commission's duty, not that of private citizens, to regulate service-providers subject to the Act and to prevent the abuses which Congress feared.[32] Furthermore, subscription services are in their infancy; because the horse has stayed in the barn so far is no reason to prop the door open indefinitely.
 
 
 67
 C. The Pivotal Importance of General Interest Programming In Defining Broadcasting
 
 
 68
 Consider the following hypothetical; an ordinary free television station, maintaining its present programming format, switches to a subscription funding mechanism by sending a signal which requires special equipment to unscramble. See e.g., Functional Music, Inc. v. FCC, 274 F.2d 543 (D.C.Cir.1958), cert. denied, 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 60 (1959) (holding that similar change by radio broadcast station did not remove it from scope of Sec. 153(o )). Under the Commission's view, the licensee would automatically be exempt from regulation as a broadcaster, even if its audience remained the same.
 
 
 69
 Yet consider the changes that would result, the effect on viewers in the same hypothetical. See maj. op. at 666. The prohibition on alien ownership no longer applies, nor do the reasonable access and equal opportunity requirements for political candidates (inviting unfair political propagandizing). 47 U.S.C. Secs. 310(b), 312(a)(7) and 315. The individual or business financing a program no longer need be identified (allowing commercial manipulation). 47 U.S.C. Secs. 317 and 508. The station is no longer subject to the Commission's Equal Employment Opportunity rules (decreasing viewers' chances of exposure to diverse viewpoints). 47 C.F.R. 73.2080 (1987). And, as the majority itself points out, other results, silly and serious, ensue; game shows on that channel need no longer be run honestly, see 47 U.S.C. Sec. 509 (prohibiting practices influencing, prearranging or predetermining the outcome in broadcast contests of knowledge, skill or chance), and unauthorized rebroadcasting of other stations' material can be done at will, see 47 U.S.C. Sec. 325(a) (prohibiting broadcast stations from rebroadcasting material from other stations without authorization). Such results are surely inconsistent with what Congress intended for the viewing public, free or paying.
 
 
 70
 At the end of the day, the broadcaster's intent to provide radio transmissions to the "public" is the critical factor. It can not be, as the Commission suggests, the "indeterminacy" of a tune-in public as opposed to a definite subscription audience of several million that controls. Rather, whether the programming is directed to a general (paying or not) audience so that broadcast regulation in the public interest is necessary must be determinative. The intent of an STV provider to disseminate a generalized entertainment and information format to as many viewers as possible, rather than to direct specialized information to a narrowly defined group, is the common sense distinction upon which to rest the need for Title III protections. Clearly, subscription service-providers, soliciting the general public, ordinarily have such an intent. Therefore, it cuts against the thrust of the Communications Act to exempt all pay programming from Title III.
 
 III. PUBLIC PARTICIPATION UNDER SEC. 309
 
 71
 The majority also endorses the Commission's ruling that a licensee's abandonment of free TV in favor of subscription service is only a "minor change." This decision renders inapplicable Sec. 309's requirement that the FCC determine "whether the public interest, convenience and necessity will be served" by such a changeover. 47 U.S.C. Sec. 309(a). It also means that the public will lose its concommitant rights to receive notice, file petitions, and participate in hearings when such a change in service is contemplated. "Therefore," as the majority concedes, "the decision by the Commission that the change from 'free' broadcasting to subscription service does not constitute a 'major change' is a decision of great significance." Maj. op. at 670.
 
 
 72
 Despite this obvious importance, the majority too readily accepts the Commission's argument that free-to-pay channel switches are "minor" simply because they are "unlike" heretofore recognized "major" changes, which are mainly technological in nature. J.A. at 117. Without further illumination, however, the FCC's reasoning is indecipherable.
 
 
 73
 The majority also concedes that, "It is counterintuitive to hold that nothing major has changed when a television viewer who is accustomed to turning to channel 9, for example, and receiving his favorite program, finds one day that upon turning to that same channel he receives merely scrambled static...." Maj. op. at 670. "Counterintuitive" is an understatement. From any rational perspective a major change, worthy of public participation, has occurred,[33] and the Commission should not be allowed to delude us otherwise.
 
 
 74
 Exemplifying the excessive deference infecting its entire opinion, the majority bows abjectly to the Commission's conclusory rationale that these shifts are "sufficiently unlike the type of modifications now considered 'major' to justify different treatment." J.A. at 117. Although the Commission's previous decisions on major versus minor changes involved in the main electromagnetic interference potential and area coverage, it does not follow that this qualitatively different kind of change does not merit inclusion in the "major" category. The Commission is indulging in wordplay that falls outside the limits of Chevron, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Chevron does not immunize unexplained interpretations that cut against the grain of commonsense and undermine statutory purpose.
 
 
 75
 The Commission argues that although no public notice at all will be required for changes from free to pay TV, subscription service providers will have an incentive to alert viewers. J.A. at 120 n. 31. To the contrary, potential subscription service providers have only an incentive to inform those viewers likely to pay for the new service. They have a strong disincentive to contact those unable to afford the new service or otherwise likely to protest.[34] Thus, for many the screen will just go black.[35]
 
 
 76
 A regular TV station could convert to STV in the first year of its license and be exempt from Title III regulation for almost five years until its renewal came up. In areas served by only one channel, this could mean an end to free television. What more "major" change could there be for those unable to afford subscription TV?[36] One of the commenters on this rule, Monroe Communications, said it well:
 
 
 77
 Full service television channels remain a rare commodity. Before one is effectively removed from its role of serving the general public and instead reclassified as a private service benefitting only a limited number of subscribers, the public should be entitled to offer its views on the change.
 
 
 78
 J.A. at 110. The Commission should have been required to explain more adequately its classification of free-to-pay channel switches as "minor changes."[37]
 
 CONCLUSION
 
 79
 I dissent from the panel majority's opinion upholding the FCC's deregulation of STV because I can find no basis for the Commission's wholesale reclassification of subscription TV as nonbroadcasting. The drafters of the 1927 Radio Act and the 1934 Communications Act thought about pay service and decided to include it within the regulatory ambit of Title III. The Commission's technological and economic arrangements justifications for saying now--fifty years later--that it is not broadcasting are transparently inadequate. Nothing requires this court to put its imprimatur on an agency interpretation, like this one, that flies in the face of the Act's purpose and intent. The Commission's coup-de-grace ruling that a free-to-pay switch is only a "minor change," which does not merit public input, tells the story; deregulatory zeal has overtaken rational statutory interpretation. The court does not do justice to its independent review function by acceding so readily to the Commission's evasion of congressional directives.
 
 
 
 [1]
 "Radio" communications under the Act include television. See Dumont Laboratories v. Carroll, 184 F.2d 153 (3rd Cir.1950), cert. denied, 340 U.S. 929, 71 S.Ct. 490, 95 L.Ed. 670 (1951)
 
 
 [2]
 This definition had its origin in Washington International Radio Telegraph Convention of 1927, which defined a "broadcasting service" as "a service carrying on the dissemination of radio communications intended to be received by the public." Radio Telegraph Convention & General Regulations. Treaties Series No. 767 (GPO, 1929). See H.R.Rep. No. 1850, 73d Cong. 2d Sess. 4 (1934); S.Rep. No. 781, 73d Cong., 2d Sess. 3 (1934)
 
 
 [3]
 See generally, Fourth Report and Order, 15 F.C.C.2d 466 (1968), affirmed National Assn. of Theatre Owners v. FCC, 420 F.2d 194 (1969), cert. denied, 397 U.S. 922, 90 S.Ct. 914, 25 L.Ed.2d 102 (1970); Earth Satellite Communications, 95 F.C.C.2d 1223, 1229-35 (1983), affirmed sub nom. New York State Commission on Cable Television v. FCC, 749 F.2d 804 (D.C.Cir.1984)
 
 
 [4]
 It would be difficult to say that the Commission's definition is in any way contrary to the plain meaning of the statute. The word "broadcast" in its common definition is "so as to scatter or be scattered in all directions (as of seed): so as to spread widely: specif: so as to reach by radio or television the greatest possible number of receiving sets." Webster's Third New International Dictionary (1961)
 
 
 [5]
 Given the technological advances in radio since the enactment of the statute, it would be most surprising if we found legislative history which did unambiguously speak to the technology now before the Court, which could be only dimly anticipated at the time of the enactment of the Act
 
 
 [1]
 Hammond, To Be or Not to Be: FCC Regulation of Video Subscription Technologies, 35 Cath.U.L.Rev. 737, 756 n. 115 (1986) (quoting Remarks of Henry M. Rivera, Commissioner, Federal Communication Commission, before the American Law Institute--American Bar Association (Mar. 29, 1984))
 
 
 [2]
 In 1941, less than a decade after the passage of the Communications Act, the Commission offered a more contemporaneous interpretation of Sec. 153(o ):
 The service which this applicant proposes will be available to the general public; any member of the public, without discrimination, may lease the equipment to receive the service. The distinguishing feature will be that those receiving the programs will pay directly rather than indirectly therefor. Operation of a station in this manner is within the definition of broadcasting.
 Muzak Corporation, 8 F.C.C. 581, 582 (1941) (emphasis added). Fifteen years later, the Commission relied on Muzak in finding that the precise service in question today, subscription television, was broadcasting. See Further Notice of Proposed Rulemaking, "Subscription Television," 3 F.C.C.2d 1 (1966); Fourth Report and Order, "Subscription Television," 15 F.C.C.2d 466 (1968). On numerous and quite recent occasions, this court has endorsed the Muzak view of Sec. 153(o ) that "the test for whether a particular activity constitutes broadcasting is whether there is 'an intent for public distribution and whether the programming is of interest to the general ... audience.' " National Ass'n of Broadcasters v. FCC, 740 F.2d 1190, 1201 (D.C.Cir.1984) (quoting Functional Music, Inc. v. FCC, 274 F.2d 543, 548 (D.C.Cir.1958), cert. denied, 361 U.S. 813, 80 S.Ct. 50, 4 L.Ed.2d 60 (1959); emphasis in original); see also Telecommunications Research & Action Center v. FCC, 801 F.2d 501, reh'g denied, 806 F.2d 1115 (D.C.Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 3196, 96 L.Ed.2d 684 (1987)).
 The majority admits that the Commission's dramatic departure from prior treatment of STV and from the general test applied to numerous other services for a quarter century represents "some inconsistency in its treatment of various forms of subscription television." Majority opinion (Maj. op.) at 667. This "inconsistency" undermines the Commission's claim to deference. As the Supreme Court has cautioned us, "An agency's interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view." I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987).
 The weight afforded an agency's interpretation depends on its "consistency" with prior agency pronouncements, as well as the length of time the agency has applied its interpretation and whether the agency made its interpretation contemporaneously with the enactment of the statute." Telecommunications Research & Action Center v. FCC, 836 F.2d 1349, 1357 n. 19 (D.C.Cir.1988) (quoting Baltimore & Annapolis R.R. v. WMATC, 642 F.2d 1365, 1371 (D.C.Cir.1980); emphasis added). All these factors weigh against the Commission's interpretation of "broadcasting" in this case.
 
 
 [3]
 The second prong of the Chevron inquiry, whether an agency's interpretation of an ambiguous statutory provision is reasonable, is also not devoid of content. 467 U.S. 837, 845, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984). The majority is mistaken in its assumption that once the first-prong Chevron inquiry is resolved by finding a genuine ambiguity, the court's role is automatically to endorse the agency interpretation. Particularly with a 50 year old statute as comprehensive as this one, we can not expect Congress to have spoken with precision on every conceivable issue. Even where legitimate ambiguity exists, the courts still have a reviewing responsibility to ensure that agencies do not act in ways contrary to the structure and principal directives of the Act. See Rettig v. Pension Benefit Guaranty Corp., 744 F.2d 133, 141 (D.C.Cir.1984)
 
 
 [4]
 Radio Act of 1927, Pub.L. No. 69-632, 44 Stat. 1162 (1927)
 
 
 [5]
 First Report in the Matter of Amendment of Part 3 of the Commission's Rules and Regulations (Radio Broadcast Services) to Provide for Subscription Television Service, 23 F.C.C. 532, 538 (1957) [hereinafter First Report]
 
 
 [6]
 68 Cong.Rec. 2880 (1927) (statement of Sen. Dill)
 
 
 [7]
 CBS v. Democratic Nat'l Comm., 412 U.S. 94, 106, 93 S.Ct. 2080, 2088, 36 L.Ed.2d 772 (1973)
 
 
 [8]
 Senators Pittman, Walsh, Copeland, and, of course, Dill, as well as Representative Davis all expressed their belief that the legislation would permit subscription-funded broadcasting. 68 Cong.Rec. 2576-77 (statement of Rep. Davis); id. at 2880-81 (statements of Sens. Walsh and Dill); id. at 3033 (statements of Sens. Dill, Copeland, Walsh and Pittman); id. at 3258 (statement of Sen. Dill) (noting one broadcaster who proposed to charge listeners). For example, Senator Walsh speculated that there might be "a man who thinks he can make more money by erecting a broadcasting station and sending out his programming only to those who pay for them...." even though this "broadcasting arrangement ... would reach only a limited audience." Id. at 3033 (emphasis added). And, Senator Pittman even speculated incorrectly that broadcasting concerns would not be able to keep making money "unless they charge those who listen...." Id. at 4110
 
 
 [9]
 The majority suggests that members of Congress may at times have used the word "broadcasting" loosely. Maj. op. at 9. When discussing subscription radio services as "broadcasting," however, it is clear that they were focusing on the dangers to the general public from broadcasters' potential control over a mass audience and saw no distinction in that regard between transmitting to paying and nonpaying general audiences
 
 
 [10]
 The bill provided the Commission with power to:
 Regulate and control any and all methods of transmitting energy, communications, or signals by radio where a charge is made to the listeners by use of any apparatus, device, or connection by wire, and prohibit all unjust and unreasonable charges to listeners.
 
 
 [68]
 Cong.Rec. 4113 (1927) (statement of Sen. Pittman; emphasis added); see also S. Rep. No. 772, 69th Cong., 1st Sess. 3 (1926). The Senate's mention of an "apparatus" or "device" to facilitate subscription-funded broadcasting demonstrates the fallacy of the Commission's argument that unforseen technological changes necessitated its redefinition of Sec. 153(o ). The measure was later deleted by the conference committee. First Report, 23 F.C.C. at 539 (1957). The Commission itself inferred, however, "that this action was predicated on the assumption that the bill at least permitted authorization by the Commission of subscription broadcasting." Id
 
 
 [11]
 68 Cong.Rec. 2744 (1927) (introduction of H.R. 16,867). Representative Bloom introduced this bill that would have prohibited any charge to radio listeners. Id. Although this bill died in committee, the Commission found that its introduction reflected "an assumption ... that the legislation as it then stood did not bar Commission authorization of subscription broadcasting." First Report, 23 F.C.C. at 540 (1957)
 
 
 [12]
 The Commission urges that Congress' choice in 1927, tacitly reaffirmed in 1934, not to prohibit subscription services altogether demonstrates an intent not to regulate such services as broadcasting. This cannot be, since the support for the Commission's power to authorize the establishment of subscription services has been found in these very same congressional deliberations, National Ass'n of Theatre Owners v. FCC, 420 F.2d 194, 201-02 (D.C.Cir.1969), cert. denied, 397 U.S. 922, 90 S.Ct. 914, 25 L.Ed.2d 102 (1970), which discuss such services as "broadcasting."
 
 
 [13]
 These requirements include, inter alia, equal opportunities (compare Section 18, Radio Act of 1927, 44 Stat. 1162, with 47 U.S.C. Sec. 315), sponsorship identification (compare Section 19, Radio Act, with 47 U.S.C. Sec. 317), and U.S. citizenship of licensees (compare Section 12, Radio Act, with 47 U.S.C. Sec. 310)
 
 
 [14]
 Section 18 provided "in substance that if any licensee shall permit a legally qualified candidate for public office to use a broadcasting station the licensee shall afford equal opportunities to all other candidates for the same office to use the station." 68 Cong.Rec. 2563 (1927) (statement of the Conference Committee)
 
 
 [15]
 Subscription television stations may, of course, also carry privately-funded programs
 
 
 [16]
 A principal purpose of the new Act was to establish a permanent regulatory Commission
 
 
 [17]
 The 1934 Act also combined in Titles II and III provisions regulating common carrier services with measures drawn from the 1927 Radio Act to govern broadcasting. Title II extended federal regulation to common carrier message services, including those point-to-point services known at the time as "radio telegraphy." See Emery, Broadcasting and Government 32 (1971). Common carriers, which provided a transmission service, were subject to entirely different regulations than broadcasters, which sold programming. See Comments of the FCC on H.R. 6431, FCC 54-601 (May 6, 1954), quoted in Further Notice of Proposed Rulemaking, "Subscription Television," 3 F.C.C.2d 1, 9 (1966). Furthermore, the Act expressly contrasts broadcasters and common carriers; "a person engaged in radio broadcasting shall not ... be deemed a common carrier." 47 U.S.C. Sec. 153(h)
 In National Ass'n of Broadcasters v. FCC, 740 F.2d 1190 (D.C.Cir.1984), this court described the tradeoff in broadcast regulation embodied in the 1927 and 1934 Acts:
 The essence of this compromise was the view that broadcasting should remain under private control in general but that certain uses of the airways, particularly political ones, were too central to democratic values to be left to the whim of the private broadcaster. Accordingly, the Radio Act imposed a specific set of restraints upon broadcasters that common carriers do not face and then, to cement the compromise explicitly provided that a broadcaster should not be regulated as a common carrier.
 Id. at 1199-1200. The 1934 Act preserved this balance and adopted the model of the Interstate Commerce Act for the regulation of common carrier communications service. See S.Rep. No. 781, 73d Cong., 2d Sess. 3 (1934) (indicating Title II "for the most part" follows provisions of the Interstate Commerce Act).
 
 
 [18]
 Radiotelegraph Convention and General Regulations, Nov. 25, 1927, 45 Stat. 2760, 2848, T.S. No. 767, at 13, 84 L.N.T.S. 97. See also H.R.Rep. No. 1850, 73d Cong., 2d Sess. 4 (1934) (definitions taken from Radio Act and international conventions); S.Rep. No. 781, 73d Cong., 2d Sess. 3 (1934)
 
 
 [19]
 Of course, not all radio transmissions fall neatly into one of these two mutually exclusive categories; many point-to-point services not intended for the public, including radio uses for aviation, navigation, and industrial firms, police departments and taxis are neither broadcast nor common-carrier services. See First Report, 23 F.C.C. at 541 (1957)
 
 
 [20]
 In National Ass'n of Theatre Owners v. FCC, 420 F.2d 194 (D.C.Cir.1969), cert. denied, 397 U.S. 922, 90 S.Ct. 914, 25 L.Ed.2d 102 (1970), we held that the "Act authorizes the Commission to license direct-charge broadcasting services." Id. at 202 (emphasis added; footnote omitted). The inescapable corollary of that authority to license a service as "broadcasting" is the power to regulate it under Title III. The result of today's ruling is to let subscription service providers, who have had their cake for two decades, eat it too
 
 
 [21]
 Prior to 1962, most television sets required special equipment to receive UHF channels, yet the Commission has never suggested these UHF stations would therefore be exempt from broadcast regulation
 
 
 [22]
 In Telecommunications Research & Action Center v. FCC, 801 F.2d 501 (D.C.Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 3196, 96 L.Ed.2d 684 (1987), we held that although teletext needs a decoder to be viewed, id. at 503, it nonetheless is "broadcasting." Id. at 514
 
 
 [23]
 Cable services are clearly technologically distinct from broadcasting. There would be no question of their regulatory status under Sec. 153(o ), not because they are not "intended to be received by the public" but because they are not radio transmissions; cable transmissions use wire rather than the broadcast spectrum. Nonetheless, in 1972 Congress chose to apply several Title III obligations to cable. See Use of Broadcast and Cablecast Facilities by Candidates for Public Office, 34 F.C.C.2d 510 at n. 2 (1972)
 It is also noteworthy that when Congress made Sec. 315's equal opportunity requirement applicable to cable in 1972, it could easily have exempted STV, which was then considered "broadcasting," but did not. Even more telling, Congress enacted for the first time Sec. 312(a)(7)'s "fair access" provisions in 1972 but did not exempt subscription services.
 
 
 [24]
 See Hammond, To Be Or Not To Be: F.C.C. Regulation of Video Subscription Technologies, 35 Cath.U.L.Rev. 737, 741 & n. 20 (1986). (citing Instructional Television Fixed Serv., 101 F.C.C.2d 50 (1985); Instructional Television Fixed Serv., 94 F.C.C.2d 1203, 1205-16 (1983); Operational Fixed Serv., 99 F.C.C.2d 715, 716 (1983); Direct Broadcast Satellites, 90 F.C.C.2d 676 (1982); Use of Private Microwave Frequencies, 86 F.C.C.2d 299, 306, 311 (198); Multipoint Distribution Serv., 48 F.C.C.2d 616, 617 (1974))
 
 
 [25]
 Id. at 741 & n. 21
 
 
 [26]
 Id. at 739 n. 15
 
 
 [27]
 The majority cites KMLA Broadcasting Corp. v. Twentieth Century Cigarette Venders Corp., 264 F.Supp. 35 (C.D.Cal.1967) for the proposition that court decisions subsequent to Functional Music have concluded that " 'pure' subscription radio services" are not broadcasting. Maj. op. at 677. KMLA Broadcasting, however, did not involve main channel transmissions at all but only the use of an FM subcarrier for an ancillary audio service. FM radio main channels, have never been exempted from broadcast regulation in the public interest. Furthermore, KMLA's transmissions indisputably were not intended for the public; the parties stipulated that "neither of plaintiffs had ... an intent to transmit their background music program to the general public." KMLA, 264 F.Supp. at 40-41
 
 
 [28]
 Of course, as the majority notes, the providers of traditionally recognized nonbroadcast subscription services probably would not turn down subscribers either. Maj. op. at 668. However, unlike those nonbroadcast transmissions, intended to provide specialized information to narrowly defined groups, see e.g., KFAB Broadcasting Co., 1 Radio Reg.2d (P & F) 403 (1963) (emergency call messages for particular doctors); Adelaide Lillian Carrell, 7 F.C.C. 219, 222 (1939) (local police messages), ordinary subscription television services are not intended to serve such specific audiences. Not only would STV providers "not ordinarily refuse service" to any member of the general public, but their programming is designed to attract as much of that public as possible. See infra note 29
 
 
 [29]
 Like traditional broadcasting, STV is designed for mass appeal. While some individual programs may appeal to particular segments of the viewing public, this is also true with regard to conventional broadcasting. Although the news, prime-time sitcoms, Saturday morning cartoons and full-length movies on regular TV may all target different groups, no one seriously contends that a station that provides programming of this sort does not intend its transmissions "to be received by the public."
 
 
 [30]
 STV audiences will by definition be likely to have more disposable income than regular TV viewers. See Hammond, Now You See It, Now You Don't: Minority Ownership in an "Unregulated" Video Marketplace, 32 Cath.U.L.Rev. 633, 643 (1983). Therefore, they will undoubtedly have a special attraction to political fundraisers
 It is folly to predict, as the FCC does, that STV will not be used for political advertising and that Title III regulation is therefore irrelevant. Different cable channels are widely used today to appeal to different interest groups. This approach allows candidates to mold or accommodate their messages to various audiences. See R. Armstrong, The Next Hurrah: The Communications Revolution in American Politics 165-90 (1988). Subscription television broadcasts could fulfill the same need. Satellite technologies like DBS could be used to transmit a candidate's latest campaign appearance and subscription teletext used to provide detailed position papers. See id. at 204-16, 270-72. The potential campaign uses of subscription video are enormous.
 
 
 [31]
 In both pay and subscription contexts, even assuming viewer control, there is an independent danger that service providers may seek to obtain a devoted audience by catering to existing viewer bias. As Benjamin Barber states:
 A political price is paid for this new activism among viewers and the apparent decentralization of television: Where television once united the nation, it will now fragment it. Those it once brought together it will now keep apart. In place of broadcasting comes the new ideal of "narrowcasting," in which each special audience is systematically typed, located, and supplied with its own special programming. Each group, each class, each race, and each religious sect can have its own programs, and even its own mini-network, specially tailored to its distinct characteristics, views, and needs. The critical communication between groups that is essential to the forging of a national culture and public vision will vanish; in its place will come a new form of communication within groups, where people need talk only to themselves and their clones.... Faction--the scourge of democracy feared by its critics from James Madison to Walter Lippmann--is given the support of technology; compromise, mutualism, and empathy--indispensable to effective democratic consensus--are robbed of their national medium. Every parochial voice gets a hearing (though only before the already converted) and the public as a whole is left with no voice. No global village, but a Tower of Babel.
 Barber, The Second American Revolution, CHANNELS, Feb.-Mar., 1982, at 21, 23-24, quoted in Hammond, supra note 1, at 758 n. 119.
 
 
 [32]
 While HBO-like channels might seem innocuous today, a similar service in the hands of an individual or group with an explicit political agenda would be more threatening. As the intervenors note, foreign controlled groups would be free under the Commission's ruling to own STV stations and propagandize over U.S. airwaves as long as they could attract paying customers
 
 
 [33]
 Subsection 309(c) states that:
 Subsection (b) of this section shall not apply ... to any application for--(A) a minor change in the facilities of any authorized station.
 47 U.S.C. Sec. 309(c)(2)(A) (emphasis added). Even a technical reading of the provision would seem to require inclusion of subscription services since they necessitate installing scrambling equipment and distributing decoders.
 
 
 [34]
 Unless a station were providing substantial programming improvements, there would be no incentive to inform existing viewers before the changeover was a fait-accompli. Most viewers, regardless of their income level, probably prefer to receive broadcast transmissions free and would oppose a change from free to subscription service. Yet, despite widespread viewer disapproval, the market might dictate subscription service as the revenue-maximizing alternative for the licensee. (Of course, a licensee might also switch service types precisely to avoid Title III regulation.) Although many viewers prefer free TV to pay, they might rather pay than have no TV at all, and so, many viewers who might oppose a proposed change might accept an accomplished transition
 
 
 [35]
 Once the majority's hypothesized "mass exodus," maj. op. at 670, of stations from free to pay service has occurred it will be too late for public participation under Sec. 309 to have any meaningful effect
 
 
 [36]
 Furthermore, the change in service also entails, as discussed above, a reduction in the regulatory protections provided even for those viewers who can afford to subscribe. See supra Part II C
 
 
 [37]
 The Commission itself initially raised the possibility of treating changes from free to pay TV as "major." It then changed its mind but never fully explained why. This court should, at a minimum, have required an adequate explanation for the FCC's change of course